UNITED STATES *v.* SING TUCK OR KING DO AND THIRTY-ONE OTHERS.

CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE SECOND CIRCUIT.

No. 591. Argued April 7, 1904.—Decided April 25, 1904.

It is one of the necessities of the administration of justice that all questions —even though fundamental—should be determined in an orderly way, and it is within the power of Congress to require one asserting the right to enter this country on the ground that he is a citizen, to establish his citizenship in some reasonable way.

A mere allegation of citizenship by a person of Chinese descent is not suffi-
cient to oust the inspector of jurisdiction under the alien immigrant law
and allow a resort to the courts without taking the appeal to the Secretary
provided for in the act, and unless such appeal has been taken and
decided a writ of *habeas corpus* will be denied.

THE facts, which involved the right to enter the United
States, of certain persons of Chinese descent who claimed to
be citizens of the United States, are stated in the opinion of
the court.

*Mr. Assistant Attorney General McReynolds* for the United
States:

The Circuit Court of Appeals did not have jurisdiction
of the appeal. The appeal should have been direct to this
court. *Am. Sug. Ref. Co.* v. *New Orleans*, 181 U. S. 277, 281;
*Union Bank* v. *Memphis*, 189 U. S. 71.

The direct course of all the later decisions, both English and
American, is to establish the rule that probable cause must
first be shown to obtain the writ of *habeas corpus*, whether it be
granted at common law or under the statute. Church on
Habeas Corpus, § 92; *Ex parte Watkins*, 3 Pet. 193; *Ex parte
Milligan*, 4 Wall. 2, 110; *Ex parte Royall*, 117 U. S. 250; *Ex
parte Terry*, 128 U. S. 301. At common law no evidence was
necessary to support the return to the writ. It was deemed
to import verity until impeached. Hurd on Hab. Corps.
Bk. 2, c. 3, §§ 8, 10; Church on Hab. Corps. §§ 122, 160, 170.
This rule is not changed by any statute of the United States.
*Crowley* v. *Christensen*, 137 U. S. 86, 94; *Holden* v. *Minnesota*,
137 U. S. 483, 491.

The purpose of the Chinese exclusion acts and regulations
adopted for making them effective is to *prevent* the landing
of Chinese persons in the United States, unless it affirmatively
appears that they are exempt from the general provisions
because officials, teachers, students, merchants, travelers, or
citizens of the United States. If officers should permit entry
of any one of that race without demanding satisfactory proof
of facts, they would grossly violate their duty. As to all

Chinese except such as claim birth in the United States, respondents do not deny this.

The return shows that of the 32 Chinamen examined, 27 made then no claim of birth in the United States and no show of right to enter therein. Five said they were born in the United States, but refused to give information to support such claim, and by their action made it incredible.

The original petition asserted citizenship upon information and belief. The return denied, upon information and belief, that respondents were citizens, and stated that they were alien Chinese laborers not entitled to entry. No denial was made of any facts set out in the return nor was application made to reply thereto in any way. Such facts must, therefore, be taken as true and the action of the court in dismissing the writ cannot be held to be error. The very ground upon which the petition was based was denied and there was nothing to put the denial in issue.

In any view of the facts brought by the return before the court it was the clear duty of the immigration officers to detain all of the respondents, and as it was their duty so to do, such detention could not be illegal. It follows, wholly irrespective of the question as to the finality of findings by immigration officers under the act of 1894, that the writ in the present case was properly dismissed, no illegal detention having been shown. *Ex parte Watkins*, 3 Pet. 201; *Wales* v. *Whitney*, 114 U. S. 571; *Ex parte Curtis*, 106 U. S. 375; *Ekiu* v. *United States*, 142 U. S. 651; *Carter* v. *McClaughry*, 183 U. S. 381.

Where the law has confided to a special tribunal the authority to hear and determine certain matters arising in the course of its duties, the decision of that tribunal, within the scope of its authority as to questions of fact is conclusive upon all others. See as to action of administrative officers in the Land Department, *Johnson* v. *Towsley*, 13 Wall. 83; *Smelting Company* v. *Kemp*, 104 U. S. 636. The courts have power to grant relief when the special tribunal acts contrary to law, or possibly where a manifest wrong has been done, and only in such cases.

*Burfenning* v. *Chicago, St. Paul &c. Railroad,* 163 U. S. 321, 323; *School of Magnetic Healing* v. *McAnnulty,* 187 U. S. 94, 108.

If the mere unsupported statement of a Chinaman that he was born in the United States, entitles him to enter, the Exclusion Acts will prove farcical.

When Chinese persons present themselves for admission into the United States it is the duty of immigration officers to pass upon their claims. If citizenship is alleged, that, like other questions of fact, must be determined by such officers. Except, possibly, in extraordinary cases an adverse decision by the immigration officer is final, subject to an appeal to the Secretary of Commerce and Labor, and it cannot be reviewed upon writ of *habeas corpus. In re Moy Quong Shing,* 125 Fed. Rep. 641. *The Gee Fook Sing Case,* 49 Fed. Rep. 146, was decided without argument. And see *Lem Moon Sing* v. *United States,* 158 U. S. 547; *Chin Bak Kan* v. *United States,* 186 U. S. 193, 200; *Japanese Emigrant Case,* 189 U. S. 97.

*Mr. Robert M. Moore,* with whom *Mr. W. W. Cantwell* was on the brief, for respondents:

A person of Chinese descent born within the United States is a citizen thereof and the provisions of the Chinese Exclusion Act do not apply to such persons. *United States* v. *Wong Kim Ark,* 169 U. S. 653.

Citizenship is a right. Every person claiming it has the constitutional right to have it determined judicially in a constitutional court.

Congress cannot withdraw from judicial cognizance a matter which is the subject of a suit at common law or in equity. This right of citizenship is safe-guarded by the Constitution of the United States, which provides that "no person shall be deprived of life, liberty or property, without *due process of law.*" See case reported in 94 Fed. Rep. 834; *Gee Fook Sing* v. *United States,* 49 Fed. Rep. 146.

*Habeas corpus* is the only, and is the proper, remedy. *Jew Wong Loy* v. *United States,* 91 Fed. Rep. 240; *In re Jung Ah*

*Lung,* 25 Fed. Rep. 141, affirmed 124 U. S. 621.   The alien act does not apply· to citizens.

The pretended trial and adjudication by the immigrant in- ·spector in these cases was ·not· due process of law.   The rules prescribed by the Secretary of Labor and Commerce are arbi- trary and unjust.

The legislature is not vested with the power to arbitrarily provide that any procedure it may choose to declare such shall be regarded as due process of law.   *Colon* v. *List,* 153 N. Y. 188; *Burton* v. *Platter,* 10 U. S. App. 657.

Art. 14 of Amds. of Const. of U. S. is a restraint on the legis- lative as well as on the executive and judicial. powers of the government, and cannot be so construed as to leave Congress free to make any process "due process of law" by its mere will. *Meyers* v. *Shields,* 61 Fed. Rep. 713; *Holden* v. *Hardy,* 169 U. S. 366; *Murray* v. *Hoboken Land Co.,* 18 How. 272; *Dorman* v. *State,* 34 Alabama, 216; *In re Ziebold,* 23 Fed. Rep. 791; Argument of Daniel Webster in *Dartmouth College* v. *Wood- ward,* 4 Wheat. 518.

As applied to judicial. proceedings the term "due process of law" means a course of proceeding according to those rules and principles which have been established in our system of juris- prudence for the protection and enforcement of private rights. It is imperative that there be a court of competent jurisdiction; that the proceeding be regular and appropriate to the question involved; and that the trial be a fair one.  *Rees* v. *Watertown,* 19 Wall. 107; *Carr* v. *Brown,* 38 Atl. Rep. 9; *Burton* v. *Platter,* 10 U. S. App. 657; *Davidson* v. *New Orleans,* 96 U. S. 97; *Dwight* v. *Williams,* 4 McLean, 581; *Parsons* v. *Russell,* 11 Michigan, 113; *Huber* v. *Riley,* 53 Pa. St. 112; *In re Ah Lee,* 5 Fed. Rep. 899; *Pennoyer* v. *Neff,* 95 U. S. 723; *Hennessey* v. *Volkening,* 30 Abb. N. Cas. 100; *Ziegler* v. *So. &c. Ala. R. Co.,* 58 Alabama, 594; *Brown* v. *Hummel,* 6 Pa. St. 86; *Jenson* v. *Union Pacific,* 6 Utah, 253.

There was no evidence before the inspector upon which he could base a judicial determination.

A Chinese inspector is in no sense a judicial officer and cannot be under the Constitution. See 32 Stat. c. 1021, § 23.

Section 1, Art. 3, Const. U. S. provides: "The judicial power of the United States shall be vested in one Supreme Court, and in such inferior courts as Congress may from time to time ordain and establish."

Section 2 provides: "That judicial power shall extend to all cases, in law and equity."

MR. JUSTICE HOLMES delivered the opinion of the court.

This is a writ of *habeas corpus* against a Chinese Inspector and Inspector of Immigration. It appears from his return that the Chinese persons concerned came from China by way of Canada and were seeking admission into the United States. On examination by an inspector five gave their names, stated that they were born in the United States, (*United States* v. *Wong Kim Ark*, 169 U. S. 649,) and answered no further questions. The rest gave their names and then stood mute, not even alleging citizenship. The inspector decided against their right to enter the country and informed them of their right to appeal to the Secretary of Commerce and Labor. No appeal was taken, and while they were detained at a properly designated detention house for return to China a petition was filed by a lawyer purporting to act on their behalf, alleging that they all were citizens of the United States, and this writ was obtained. In the Circuit Court the detention was adjudged to be lawful, and the writ was dismissed without a trial on the merits. This decision was reversed by the Circuit Court of Appeals on the ground that the parties concerned were entitled to a judicial investigation of their status.

By the act of August 18, 1894, 28 Stat. 372, 390, "In every case where an alien is excluded from admission into the United States under any law or treaty now existing or hereafter made, the decision of the appropriate immigration or customs officers, if adverse to the admission of such alien, shall be final, unless

reversed on appeal to the Secretary of the Treasury." The jurisdiction of the Treasury Department was transferred to the Department of Commerce and Labor by the act of February 14, 1903, 32 Stat. 825. It was held by the Circuit Court of Appeals that the act of 1894 should not be construed to submit the right of a native-born citizen of the United States to return hither to the final determination of executive officers, and the conclusion was assumed to follow that these cases should have been tried on their merits. Before us it was argued that by the construction of the statute the fact of citizenship went to the jurisdiction of the immigration officers, see *Gonzales* v. *Williams*, 192 U. S. 1, 7; *Miller* v. *Horton*, 152 Massachusetts, 540, 548; and therefore that the statute did not purport to apply to one who was a citizen in fact. We are of opinion however that the words quoted apply to a decision on the question of citizenship, and that, even if it be true that the statute could not make that decision final, the consequence drawn by the Circuit Court of Appeals does not follow and is not correct.

We shall not argue the meaning of the words of the act. That must be taken to be established. *Lem Moon Sing* v. *United States*, 158 U. S. 538, 546, 547. As to whether or not the act could make the decision of an executive officer final upon the fact of citizenship we leave the question where we find it. The *Japanese Immigrant Case*, (*Yamataya* v. *Fisher*,) 189 U. S. 86, 97; *Fok Yung Yo* v. *United States*, 185 U. S. 296, 304, 305. See *Chin Bak Kan* v. *United States*, 186 U. S. 193, 200. Whatever may be the law on that point, the decisions just cited are enough to show that it is too late to contend that the act of 1894 is void as a whole. But if the act is valid, even if ineffectual on this single point, then it points out a mode of procedure which must be followed before there can be a resort to the courts. In order to act at all the executive officer must decide upon the question of citizenship. If his jurisdiction is subject to being upset, still it is necessary that he should proceed if he decides that it exists. An appeal is provided by the

statute. The first mode of attacking his decision is by taking that appeal. It the appeal fails it then is time enough to consider whether upon a petition showing reasonable cause there ought to be a further trial upon *habeas corpus*.

We perfectly appreciate, while we neither countenance nor discountenance, the argument drawn from the alleged want of jurisdiction. But while the consequence of that argument if sound is that both executive officers and Secretary of Commerce and Labor are acting without authority, it is one of the necessities of the administration of justice that even fundamental questions should be determined in an orderly way. If the allegations of a petition for *habeas corpus* setting up want of jurisdiction, whether of an executive officer or of an ordinary court, are true, the petitioner theoretically is entitled to his liberty at once. Yet a summary interruption of the regular order of proceedings, by means of the writ, is not always a matter of right. A familiar illustration is that of a person imprisoned upon criminal process by a state court under a state law alleged to be unconstitutional. If the law is unconstitutional the prisoner is wrongfully held. Yet except under exceptional circumstances the courts of the United States do not interfere by *habeas corpus*. The prisoner must in the first place take his case to the highest court of the State to which he can go, and after that he generally is left to the remedy by writ of error if he wishes to bring the case here. *Minnesota* v. *Brundage,* 180 U. S. 499; *Baker* v. *Grice,* 169 U. S. 284. In *Gonzales* v. *Williams,* 192 U. S. 1, there was no use in delaying the issue of the writ until an appeal had been taken, because in that case there was no dispute about the facts but merely a question of law. Here the issue, if there is one, is pure matter of fact, a claim of citizenship under circumstances and in a form naturally raising a suspicion of fraud.

Considerations similar to those which we have suggested lead to a further conclusion. Whatever may be the ultimate rights of a person seeking to enter the country and alleging that he is a citizen, it is within the power of Congress to provide at

least for a preliminary investigation by an inspector, and for
a detention of the person until he has established his citizen-
ship in some reasonable way.   If the person satisfies the in-
spector, he is allowed to enter the country without further
trial.   Now, when these Chinese, having that opportuntiy, saw
fit to refuse it, we think an additional reason was given for not
allowing a *habeas corpus* at that stage.   The detention during
the time necessary for investigation was not unlawful, even if
all of these parties were citizens of the United States and were
not attempting to upset the inspection machinery by a trans-
parent device.   *Wong Wing* v. *United States*, 163 U. S. 228, 235.
They were offered a way to prove their alleged citizenship and
to be set at large, which would be sufficient for most people who
had a case and which would relieve the courts.   If they saw
fit to refuse that way, they properly were held down strictly
to their technical rights.

But it is said that if, under any circumstances, the question
of citizenship could be left to the final decision of an executive
officer, the Chinese Regulations made under the statutes by
the Department of Commerce and Labor are such that they do
not allow a citizen due process of law, and the same argument
is urged in favor of the right to decline to take any part in such
proceedings from the outset.   The rules objected to require
the officer to prevent communication with the parties other
than by officials under his control, and to have them examined
promptly touching their right to admission.   The examination
is to be apart from the public, in the presence of the govern-
ment officials and such witnesses only as the examining officer
shall designate.   This last is the provision especially stigma-
tized.   It is said that the parties are allowed to produce only
such witnesses as are designated by the officer.   But that is a
plain perversion of the meaning of the words.   If the witnesses
referred to are not merely witnesses to the examination, if they
are witnesses in the cause, still the provision only excludes such
witnesses at the discretion of the officer pending the examina-
tion of the party concerned—a natural precaution in this class

of cases, the reasonableness of which does not need to be explained. It is common in ordinary trials.. No right is given to the officer to exercise any control or choice as to the witnesses to be heard, and no such choice was attempted in fact. On the contrary, the parties were told that if they could produce two witnesses who knew that they had the right to enter, their testimony would be taken and carefully considered, and various other attempts were made to induce the suggestion of any evidence or help to establish the parties' case, but they stood mute.. The separate examination is another reasonable precaution, and it is required to take place promptly to avoid the hardship of a long detention. In case of appeal counsel are permitted to examine the evidence, Rule 7, and it is implied that new evidence, briefs, affidavits and statements may be submitted, all of which can be forwarded with the appeal. Rule 9. The whole scheme is intended to give as fair a chance to prove a right to enter the country as the necessarily summary character of the proceedings will permit.

We are of opinion that the attempt to disregard and override the provisions of the statutes and the rules of the department and to swamp the courts by a resort to them in the first instance must fail. We may add that, even if it is beyond the power of Congress to make the decision of the department final upon the question of citizenship, we agree with the Circuit Court of Appeals that a petition for *habeas corpus* ought not to be entertained, unless the court is satisfied that the petitioner can make out at least a *prima facie* case. A mere allegation of citizenship is not enough. But, before the courts can be called upon, the preliminary sifting process provided by the statutes must be gone through with. Whether after that a further trial may be had we do not decide.

*Judgment reversed.*

MR. JUSTICE BREWER, with whom concurred MR. JUSTICE PECKHAM, dissenting.

I am unable to concur in either the foregoing opinion or

judgment. I have heretofore dissented in several cases involving the exclusion or expulsion of the Chinese, but, although my views on the questions are unchanged, I do not care to repeat anything then said. I pass rather to consider the present case and the declarations of the court. That is, as stated in the opinion, one of persons claiming to be citizens of the United States denied by an inspector of immigration—a mere ministerial officer—the right to enter the country, and who are now informed by this court that their application to the courts for the enforcement of that right must be denied. They are told that their only remedy is by appeal from one ministerial officer to another.

The decision is based upon the act of August 18, 1894, 28 Stat. 372, 390, which provides:

"In every case where an alien is excluded from admission into the United States under any law or treaty now existing or hereafter made, the decision of the appropriate immigration or customs officers, if adverse to the admission of such alien, shall be final, unless reversed on appeal to the Secretary of the Treasury."

But by its very terms that act applies only to an alien, and these parties assert that they are not aliens. If not aliens, certainly that act is inapplicable. So affirms Rule 2, prescribed by the Secretary of Commerce and Labor, concerning the immigration of Chinese persons, which reads: "If the Chinese person has been born in the United States, neither the immigration acts nor the Chinese exclusion acts prohibiting persons of the Chinese race, and especially Chinese laborers, from coming into the United States apply to such person." So this court has held at the present term. *Gonzales* v. *Williams*, 192 U. S. 1, decided January 4, 1904. In that case it appeared that Isabella Gonzales, an unmarried woman, coming from Porto Rico to New York, was prevented from landing and detained by the immigration commissioner as an alien immigrant. A writ of *habeas corpus* was issued on her behalf by the Circuit Court of the United States for the Southern District of

New York. Upon a hearing the writ was dismissed and she remanded to the custody of the commissioner. On appeal to this court that decision was reversed, and it was said in the opinion (p. 7):

"If she was not an alien immigrant within the intent and meaning of the act of Congress entitled 'An act in amendment to the various acts relative to immigration and the importation of aliens under contract, or agreement to perform labor,' approved March 3, 1891, 26 Stat. 1084, c. 551, the commissioner had no power to detain or deport her, and the final order of the Circuit Court must be reversed."

There, as here, the applicant had not appealed from the decision of the immigration officer to the Secretary of the Treasury; that fact was pleaded in the return to the writ, and on the argument before us this act of August 18, 1894, was cited by the government and the argument made that the remedy was by appeal to the Secretary of the Treasury. I quote the language of the Solicitor General as reported (p. 4):

"The act of August 18, 1894, 28 Stat. 390, makes the decision of the appropriate immigration or customs officer, if adverse to the admission of an alien, final unless reversed on appeal to the Secretary of the Treasury. Even if appellant herein was ultimately entitled to a writ of *habeas corpus*, she was not in a position justly to obtain the writ until she had prosecuted an unavailing appeal to the Secretary of the Treasury, and thus pursued her remedy in the executive course to the uttermost."

That case did not hold that the applicant was a citizen of the United States, but only that—being a subject of Porto Rico, an island ceded to the United States, and, as adjudged by a bare majority of this court in conflicting opinions, not within the full scope of constitutional protection—she was not an alien immigrant. Here the petitioners claim that they are citizens by birth, and the decision is that nevertheless they cannot be heard in a court to prove the fact which they allege. There the petition disclosed both a question of law and one of fact; for not until the return to the writ was the question of fact

eliminated; here on the face of the petition only a question of fact is presented for the law applicable had been fully settled by the decision of this court in *United States* v. *Wong Kim Ark,* 169 U. S. 649.

But it is said that, inasmuch as Congress has provided for an appeal from the immigration officer to the Secretary of the Treasury, or rather, since the recent act transferring jurisdiction to the Department of Commerce and Labor, to the Secretary of the latter department, the orderly administration of affairs requires that the remedy by appeal to the Secretary should be followed.   It was not so held in the *Gonzales* case, and I do not appreciate why it should be deemed necessary in the case of one claiming to be a citizen and not deemed necessary in respect to one who is merely not an alien immigrant. We have called American citizenship an "inestimable heritage," *Chin Bak Kan* v. *United States,* 186 U. S. 193, 200, and I cannot understand why one who claims it should be denied the earliest possible hearing in the courts upon the truth of his claim.

Why should any one who claims the right of citizenship be denied prompt access to the courts?   If it be an "inestimable heritage," can Congress deprive one of the right to a judicial determination of its existence, and ought the courts to unnecessarily avoid or postpone an inquiry thereof?   If it be said that the conduct of these petitioners before the inspector was not such as to justify a belief in the probability of their claim of citizenship, it is sufficient answer that they assert the claim and ask a right to be heard.   I never supposed that courts could deny a party a hearing on the ground that they did not believe it probable that he could establish the claim which he makes.

The postponement of the right to judicial inquiry until after the remedy by appeal to the Secretary has been exhausted is justified by analogy to the rule which restrains this court from interfering with the orderly administration of criminal law in the courts of a State until after a final determination by the

highest court of that State. But there is this essential dif-
ference: To the highest court of a State a writ of error runs
from this court, and there is, therefore, propriety in wait-
ing until the final decision of the courts of the States, the pre-
sumption being always that they will uphold the Constitution
of the United States, and enforce any rights granted by it.

In *Ex parte Royall,* 117 U. S. 241, 251, 252, this court said:

"Does the statute imperatively require the Circuit Court,
by writ of *habeas corpus,* to wrest the petitioner from the
custody of the state officers in advance of his trial in the state
court? We are of opinion that while the Circuit Court has the
power to do so, and may discharge the accused in advance of
his trial if he is restrained of his liberty in violation of the
National Constitution, it is not bound in every case to exercise
such a power immediately upon application being made for the
writ. We cannot suppose that Congress intended to compel
those courts, by such means, to draw to themselves, in the first
instance, the control of all criminal prosecutions commenced
in state courts exercising authority within the same territorial
limits, where the accused claims that he is held in custody in
violation of the Constitution of the United States. The in-
junction to hear the case summarily, and thereupon 'to dispose
of the party as law and justice require,' does not deprive the
court of discretion as to the time and mode in which it will
exert the powers conferred upon it. That discretion should
be exercised in the light of the relations existing, under our
system of government, between the judicial tribunals of the
Union and of the States, and in recognition of the fact that the
public good requires that those relations be not disturbed by
unnecessary conflict between courts equally bound to guard
and protect rights secured by the Constitution. . . . This
court holds that where a person is in custody, under process
from a state court of original jurisdiction, for an alleged offence
against the laws of such State, and it is claimed that he is re-
strained of his liberty in violation of the Constitution of the
United States, the Circuit Court has a discretion, whether it

will discharge him, upon *habeas corpus*, in advance of his trial in the court in which he is indicted; that discretion, however, to be subordinated to any special circumstances requiring immediate action.   When the state court shall have finally acted upon the case, the Circuit Court has still a discretion whether, under all the circumstances then existing, the accused, if convicted, shall be put to his writ of error from the highest court of the State, or whether it will proceed, by writ of *habeas corpus*, summarily to determine whether the petitioner is restrained of his liberty in violation of the Constitution of the United States."

But here there is no appeal or writ of error from the decision of the Secretary to this or to any other court, and the remedy which must be pursued then as now is only that of *habeas corpus*.   Indeed, in the opinion the court does not give to these petitioners encouragement to believe that there can be any judicial examination, even after the decision by the Secretary against their claim of American citizenship.   If a judicial hearing at any time is not in terms denied, it is, at least, like a famous case of old, passed to "a convenient season."   Meantime the American citizen must abide in the house of detention.

Further, there are special reasons why this prompt judicial inquiry by the writ of *habeas corpus* should be sustained.   On July 27, 1903, the Secretary of Commerce and Labor, as authorized by statute, promulgated certain regulations concerning the admission of Chinese persons.   Rule 4 named a dozen ports at which alone such persons should be permitted to enter, Malone, N. Y., where these petitioners are detained, being one of the number.   Rules 6, 7, 8, 9, 21 and 22 are as follows:

"RULE 6. Immediately upon the arrival of Chinese persons at any port mentioned in Rule 4 it shall be the duty of the officer in charge of the administration of the Chinese exclusion laws to adopt suitable means to prevent communication with them by any persons other than officials under his control, to have said Chinese persons examined promptly, as by law pro-

vided, touching their right to admission and to permit those proving such right to land.

"RULE 7. The examination prescribed in Rule 6 should be separate and apart from the public, in the presence of government officials and such witness or witnesses only as the examining officer shall designate, and, if, upon the conclusion thereof, the Chinese applicant for admission is adjudged to be inadmissible, he should be advised of his right of appeal, and his counsel should be permitted, after duly filing notice of appeal, to examine, but not to make copies of, the evidence upon which the excluding decision is based.

"RULE 8. Every Chinese person refused admission under the provisions of the exclusion laws by the decision of the officer in charge at the port of entry must, if he shall elect to take an appeal to the Secretary, give written notice thereof to said officer within two days after such decision is rendered.

"RULE 9. Notice of appeal provided for in Rule 8 shall act as a stay upon the disposal of the Chinese person whose case is thereby affected until a final decision is rendered by the Secretary; and within three days after the filing of such notice, unless further delay is required to investigate and report upon new evidence, the complete record of the case, together with such briefs, affidavits and statements as are to be considered in connection therewith, shall be forwarded to the Commissioner General of Immigration by the officer in charge at the port of arrival, accompanied by his views thereon in writing; but on such appeal no evidence will be considered that has not been made the subject of investigation and report by the said officer in charge."

"RULE 21. The burden of proof in all cases rests upon Chinese persons claiming the right of admission to, or residence within, the United States, to establish such right affirmatively and satisfactorily to the appropriate government officers, and in no case in which the law prescribes the nature of the evidence to establish such right shall other evidence be accepted in lieu thereof, and in every doubtful case the benefit of the doubt

shall be given by administrative officers to the United States government.

"RULE 22. No authenticated copy of a judicial finding that a Chinese person was born in the United States shall be accepted as conclusive in favor of the person presenting it, unless he be completely identified as the person to whom such authenticated copy purports to relate."

By Rule 6 it is the duty of the inspector to prevent any communication between the immigrant and any person other than his own officials. In other words, no communication with counsel or with friends is permitted. By Rule 7 the examination is to be private, in the presence only of government officials and such witnesses as the examining officer shall designate. The most notorious outlaw in the land, when charged by the United States with crime, is, by constitutional enactment, (Art. 6, Amendments U. S. Constitution,) given compulsory process for obtaining witnesses in his favor and the assistance of counsel for his defence, but the Chinaman—although by birth a citizen of the United States—is thus denied counsel and the right of obtaining witnesses. After he has been adjudged inadmissible then, and then for the first time, is he permitted to have counsel and advised of his right of appeal, and such counsel, after filing notice of appeal, is permitted to examine but not make copies of the testimony upon which the excluding order is based. By Rule 8, if he desires to appeal, he must give written notice thereof within two days after the decision. By Rule 9, within three days after the filing of notice a complete record of the case is transmitted to the Commissioner General of Immigration, and on such appeal no evidence will be considered that has not been made the subject of investigation and report by the inspector. Can anything be more harsh and arbitrary? Coming into a port of the United States, as these petitioners did into the port of Malone, placed as they were in a house of detention, shut off from communication with friends and counsel, examined before an inspector with no one to advise or counsel, only such witnesses present as the in-

spector may designate, and upon an adverse decision compelled to give notice of appeal within two days, within three days the transcript forwarded to the Commissioner General, and nothing to be considered by him except the testimony obtained in this Star Chamber proceeding. This is called due process of law to protect the rights of an American citizen, and sufficient to prevent inquiry in the courts.

But is is said that the applicants did not prove before the immigration officer that they were citizens, that some simply alleged the fact, while others said nothing, that they were told that if they would give the names of two witnesses their testimony would be taken and considered. But what provision of law is there for compelling the attendance of witnesses before such immigration officer or for taking depositions, and of what avail would be an *ex parte* inquiry of such witnesses? Must an American citizen, seeking to return to this his native land, be compelled to bring with him two witnesses to prove the place of his birth or else be denied his right to return, and all opportunity of establishing his citizenship in the courts of his country? No such rule is enforced against an American citizen of Anglo-Saxon descent, and if this be, as claimed, a government of laws and not of men, I do not think it should be enforced against American citizens of Chinese descent.

Again, by Rule 21, the burden of proof is cast upon the applicant, no other evidence is to be accepted except that which the law prescribes, and in every doubtful case the benefit of the doubt is to be given to the government. And by Rule 22 a judicial finding of citizenship is not to be accepted as conclusive unless the party presenting it is "completely identified." I showed in my dissenting opinion in *Fong Yue Ting* v. *United States*, 149 U. S. 698, 740, that expulsion was punishment. That proposition was not denied by the majority of the court when applied to a citizen but only as applied to aliens (p. 709). If expulsion from the country is punishment for crime when applied to a citizen, can it be that the rule which requires the government to assume the burden of proof and which clothes

the accused with the presumption of innocence can be changed by casting upon the individual the burden of showing that he is one not liable to such punishment? Can it be that the benefit of a doubt which attaches to all other accused persons is taken away from one simply because he is a Chinaman? And can it be that when one produces a judicial finding of citizenship such finding can be brushed one side unless the identity of the individual in whose behalf the finding was made is established beyond doubt?

I cast no reflections upon the immigration officer in the present case. I am simply challenging a system and provisions which place within the arbitrary power of an individual the denial of the right of an American citizen to free entrance into this country, and put such denial outside the scope of judicial inquiry. It may be true that a ministerial officer, in a secret and private investigation, may strive to ascertain the truth and to do justice, but unless we blind our eyes to the history of the long struggle in the mother country to secure protection to the liberty of the citizen, we must realize that a public investigation before a judicial tribunal, with the assistance of counsel and the privilege of cross-examination, is the best, if not the only, way to secure that result.

In my judgment we are making a curious judicial history. In *Yick Wo* v. *Hopkins,* 118 U. S. 356, 369, decided in 1886, we said:

"The Fourteenth Amendment to the Constitution is not confined to the protection of citizens. It says: 'Nor shall any State deprive any person of life, liberty, or property without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.' These provisions are universal in their application to all persons within the territorial jurisdiction, without regard to any differences of race, of color or of nationality; and the equal protection of the laws is a pledge of the protection of equal laws."

In *United States* v. *Wong Kim Ark,* 169 U. S. 649, decided in 1898, the petitioner, a Chinese person born in the United

States, returning from China, was refused permission to land, and was restrained of his liberty by the collector, the officer then charged with that duty. Without making any appeal from the decision of such local officer, although the law as to appeal to the Secretary was then the same as now, he sued out a writ of *habeas corpus* from the District Court of the United States, which court, after hearing, discharged him on the ground that he was born within the United States and therefore a citizen thereof. On appeal to this court that decision was affirmed. No one connected with the case doubted that the immigration and exclusion laws had no application to him if he were a citizen or questioned his right to appeal in the first instance to the courts for his discharge from the illegal restraint.

In *Chin Bak Kan* v. *United States, supra,* decided in 1902, it appeared that Chin Bak Kan was brought before a commissioner of the United States charged with wrongfully coming in and remaining within the United States. After a hearing he was adjudged guilty of the charge by the commissioner and ordered removed to China. An appeal was taken to the District Court of the United States but the appeal was dismissed, and thereupon the case was brought here. The jurisdiction of the commissioner was challenged, and in disposing of that the court said (p. 200):

"A United States commissioner is a *quasi* judicial officer, and in these hearings he acts judicially. Moreover, this case was taken by appeal from the commissioner to the judge of the District Court, and his decision was affirmed, so that there was an adjudication by a United States judge in the constitutional sense as well as by the commissioner acting as a judge in the sense of the statute."

In the *Japanese Immigrant Case,* 189 U. S. 86, 100, decided in 1903, this court, while sustaining the action of the ministerial officers, said:

"But this court has never held, nor must we now be understood as holding, that administrative officers, when executing

the provisions of a statute involving the liberty of persons, may disregard the fundamental principles that inhere in 'due process of law' as understood at the time of the adoption of the Constitution. One of these principles is that no person shall be deprived of his liberty without opportunity, at some time, to be heard, before such officers, in respect of the matters upon which that liberty depends—not necessarily an opportunity upon a regular set occasion, and according to the forms of judicial procedure, but one that will secure the prompt, vigorous action contemplated by Congress, and at the same time be appropriate to the nature of the case upon which such officers are required to act. Therefore, it is not competent for the Secretary of the Treasury or any executive officer, at any time within the year limited by the statute, arbitrarily to cause an alien, who has entered the country, and has become subject in all respects to its jurisdiction, and a part of its population, although alleged to be illegally here, to be taken into custody and deported without giving him all opportunity to be heard upon the questions involving his right to be and remain in the United States. No such arbitrary power can exist where the principles involved in due process of law are recognized."

This was in the case of one confessedly an alien.

Now the courts hold that parties claiming to be citizens can have that claim determined adversely by a mere ministerial officer, and be denied the right of immediate appeal to the courts for a judicial inquiry and determination thereof. I cannot believe that the courts of this republic are so burdened with controversies about property that they cannot take time to determine the right of personal liberty by one claiming to be a citizen.

Further, even if it should be proved that these petitioners are not citizens of the United States but simply Chinese laborers seeking entrance into this country, it may not be amiss to note the significance of the act of April 29, 1902, 32 Stat. 176, reënacting and continuing the prior laws respecting the exclusion of the Chinese, "so far as the same are not inconsistent

with treaty obligations," taken in connection with this provision in article 4 of the treaty with China, proclaimed December 8, 1894, "that Chinese laborers or Chinese of any other class, either permanently or temporarily residing in the United States, shall have for the protection of their persons and property all rights that are given by the laws of the United States to citizens of the most favored nation, excepting the right to become naturalized citizens." I am not astonished at the report current in the papers that China has declined to continue this treaty for another term of ten years.

Finally, let me say that the time has been when many young men from China came to our educational institutions to pursue their studies, when her commerce sought our shores, and her people came to build our railroads, and when China looked upon this country as her best friend. If all this be reversed and the most populous nation on earth becomes the great antagonist of this republic, the careful student of history will recall the words of Scripture, "they have sown the wind, and they shall reap the whirlwind," and for cause of such antagonism need look no further than the treatment accorded during the last twenty years by this country to the people of that nation.

I am authorized to say that MR. JUSTICE PECKHAM concurs in this dissent.