# UNITED STATES ex rel. BRADLEY v. WATKINS.

### No. 281, Docket 20647.

Circuit Court of Appeals, Second Circuit.

July 23, 1947.

AUGUSTUS N. HAND, Circuit Judge, dissenting.

George C. Dix and David S. Kumble, both of New York City, for appellant.

John F. X. McGohey, U. S. Atty., of New York City (Harold J. Raby, Asst.

U. S. Atty., of New York City, of counsel), for appellee.

Before L. HAND, SWAN and AUGUSTUS N. HAND, Circuit Judges.

SWAN, Circuit Judge.

By writ of habeas corpus the relator, a native-born citizen of Norway, challenged the legality of his detention by immigration officials at Ellis Island. His petition alleged that he was illegally held as an alien enemy under an internment order issued by the Attorney General of the United States; but the respondent's return to the writ asserted that he was detained pursuant to an exclusion order, dated October 14, 1941, of a board of special inquiry, and the Assistant District Attorney stated for the record that the relator was no longer held as an alien enemy and "any order to that effect which is outstanding is withdrawn." At the hearing the following extraordinary facts appeared without dispute.

Bradley, a Norwegian and formerly a member of the Quisling party, was seized in Greenland by a landing party from a United States Coast Guard vessel before we were at war with Germany and Japan. In August 1941 he had left his native land on a Norwegian vessel bound for Greenland, where he was to be employed by the Norwegian Meteorological Institute as a meteorologist and wireless operator. He landed in Greenland on September 3d and remained ashore until he was taken into custody by the Coast Guard vessel on the night of September 14th. From that vessel he was transferred to another vessel of the United States Navy which brought him as a prisoner and against his will to the port of Boston on October 14, 1941. On that date he was taken before a board of special inquiry of the Immigration Service and given a hearing as an "applicant for admission to the United States." Although the hearing disclosed the manner of his arrival and that he never intended to come to the United States, the board held that "the applicant should be classified as a potential immigrant" and ordered his exclusion as an immigrant for lack of an unexpired immigration visa, and cognate grounds.[1] He was asked if he desired to appeal from the board's decision to the Attorney General, and replied in the negative. After being held in custody at the East Boston Immigration Station until April 1943, he was transferred to Ellis Island for internment as an alien enemy pursuant to an order of the Attorney General. See 50 U.S.C.A. § 21. Thereafter he was transferred to the detention station at Bismark, N. D., given limited parole, and employed as a track worker on the Northern Pacific Railroad. In April 1944 the Attorney General ordered that the relator's internment be continued, and he was subsequently returned to Ellis Island and is being held by the respondent for deportation to Norway, where apparently the Norwegian government wishes to put him on trial as a war criminal.[2]

At the hearing Bradley testified in his own behalf and the respondent put in evidence a transcript of the proceedings before the board of special inquiry in Boston, identified by the testimony of Mr. Lieberman, an attorney of the Immigration and Naturalization Service. The district judge wrote an opinion in which he found as a fact that the relator did not come to the

[1] "Chairman to Applicant: You have been denied admission to the United States by this Board as an immigrant not in possession of an unexpired immigration visa, as required by Sec. 13(a) (1) of the Immigration Act of 1924, as amended [8 U.S.C.A. § 213(a) (1)]; as one not in possession of an unexpired passport or official document in the nature of a passport, as required by the Passport Act of May 22, 1918, as amended [22 U.S.C.A. § 223 et seq.], and Executive Order No. 8766 of June 3, 1941; as one not in possession of a valid visa (and not being excepted therefrom as an emergency case as defined by the Sec-

retary of State), a reentry permit, or border-crossing identification card, as required by Section 30 of the Alien Registration Act, 1940 [8 U.S.C.A. § 451]; and, under Section 3 of the Act of Feb. 5, 1917 [8 U.S.C.A. § 136], as a person likely to become a public charge."

[2] A letter from the Ambassador of Norway to the Secretary of State, dated May 24, 1946, states: "He is most urgently needed as a defendant and as a principal witness at the prosecution proceedings against the Nazis in Norway." This letter was excluded from evidence but appears as relator's exhibit 7 for identification.

United States voluntarily but concluded that this was immaterial, that the board of special inquiry had jurisdiction to inquire into the case and its order of exclusion was lawful, and that the relator had failed to exhaust his administrative remedy by an appeal from the board's decision. An order was entered November 26, 1946 dismissing the writ and remanding the relator to the custody of the respondent. Thereafter, on March 10, 1947 the district court granted the relator's motion to reopen the case; and a further hearing was had which resulted in the resettled order of March 20, 1947 again dismissing the writ. This is the order before us on appeal.

The first question for consideration is whether the appellant is barred from obtaining a writ of habeas corpus because he failed to take an administrative appeal from the order of exclusion. If he was an alien to whom the immigration laws were inapplicable, he was not obliged to resort to an appeal to the Attorney General. Gonzales v. Williams, 192 U.S. 1, 24 S.Ct. 177, 48 L.Ed. 317. That was the case of a Porto Rican who was detained at the port of New York by the Commissioner of Immigration in 1902 as an "alien immigrant," in order that she might be returned to Porto Rico if it appeared that she was likely to become a public charge. It was held that since she was not an alien immigrant within the meaning of the immigration laws after Spain had ceded Porto Rico to the United States, the commissioner had no power to detain or deport her and she could obtain release on habeas corpus notwithstanding that no appeal had been taken from the administrative ruling. In United States v. Sing Tuck, 194 U.S. 161, 24 S.Ct. 621, 623, 48 L.Ed. 917, a Chinese, who claimed to be a United States citizen, sued out a writ of habeas corpus without having appealed to the Secretary of Commerce and Labor from the administrative order of exclusion. The writ was dismissed on the ground that the relator had not exhausted his administrative remedy;

and Justice Holmes said of the Gonzales case, "there was no use in delaying the issue of the writ until an appeal had been taken, because in that case there was no dispute about the facts, but merely a question of law." That is equally true here. The undisputed facts raise a question of law as to whether the relator was an alien immigrant. If that question is answered in his favor, his failure to take an appeal to the Attorney General should not be fatal to his claim.

■■■ Section 153 of Title 8 of the Code, 8 U.S.C.A. § 153, provides that "boards of special inquiry shall be appointed * * * at the various ports of arrival as may be necessary for the prompt determination of all cases of immigrants * * * under the provisions of the law." "Immigrant," as defined in 8 U.S.C.A. § 203, means "any alien departing from any place outside the United States destined for the United States," with specified exceptions. This certainly presupposes a voluntary departure and destination, although in the case of an infant or a person non compos mentis the volition may no doubt be exercised by a lawful guardian. But it is an abuse of words to say that an alien who is forcibly brought here against his will by a United States worship has "departed" from the foreign port; the reasonable connotation of that word is that the alien has taken his leave from the terminus a quo with the purpose of going to the terminus ad quem. The immigration acts, we submit, deal with aliens who are voluntarily seeking to enter the United States.[3] Moffitt v. United States, 9 Cir., 128 F. 375, held that an alien brought to this country against his will and under a promise to take him back on the return voyage was not an immigrant within the meaning of section 10 of the Act of March 3, 1891, 26 Stat. 1086. Certainly the appellant was not "seeking to enter" the United States when brought to the port of Boston. Nor has he ever made an entry. When held at the Immigration Station at East Boston he is to be regarded as stopped

---

[3] Many sections of the statutes are instinct with this idea: for example, 8 U.S.C.A. § 207, "Every immigrant applying for an immigration visa * * *"; 22 U.S.C.A. § 223(a), "For any alien to depart from or enter or attempt to depart from or enter the United States * * *"; 8 U.S.C.A. § 451, "Any alien seeking to enter the United States who does not present a visa * * *".

at the boundary line, and when his prison bounds were enlarged by committing him to the custody of the Attorney General for detention and parole in North Dakota, the nature of his stay in the United States was not changed. See Kaplan v. Tod, 267 U.S. 228, 45 S.Ct. 257, 69 L.Ed. 585. Moreover, the section dealing with the deportation of aliens brought in in violation of law, 8 U.S.C.A. § 154, which provides that they "shall be immediately sent back, in accommodations of the same class in which they arrived," unless immediate deportation is not practicable or proper, and that the cost of their maintenance while on land "shall be borne by the owner or owners of the vessels on which they respectively came," plainly has no application to a vessel of the United States Navy. No one, we think, would venture to suggest that boards of special inquiry have jurisdiction to pass upon the admissibility of prisoners of war brought to our shores by the armed forces of the United States. With respect to the immigration laws the status of the relator on arrival was the same, in our opinion, as that of a prisoner of war. Whether or not international law was violated by his seizure in and removal from Greenland before we became a belligerent, and whether his detention could be justified if he were still held in custody by the Navy, we need not consider, since the only justification asserted by the respondent for his detention is the exclusion order of October 14, 1941. We hold that order no justification because Bradley was not an immigrant and, consequently, the board of special inquiry had no jurisdiction to make its order of exclusion.

The respondent argues that if sufficient ground be shown for the relator's present detention, he is not to be discharged for defects in the original arrest or commitment, Bilokumsky v. Tod, 263 U.S. 149, 158, 44 S.Ct. 54, 68 L.Ed. 221; and that he is clearly excludable notwithstanding his involuntary arrival, since he is admittedly an alien and not in possession of an immigration visa or other document entitling him to admission to the United States. Three cases are relied upon in support of this proposition. United States ex rel. Ling Yee Suey v. Spar, 2 Cir., 149 F.2d 881; Blumen v. Haff, 9 Cir., 78 F.2d 833; United

States ex rel. Fitleberg v. McCandless, 3 Cir., 47 F.2d 683. Each of these authorities we think distinguishable. The first involved Chinese members of the crew who were arrested by the city police and taken ashore to answer charges of rioting aboard their ship while it was in the Port of New York. Before the criminal charges were dismissed, their ship had sailed. Thereafter they were picked up by the immigration authorities for deportation. Although the warrants of arrest were defective, we held that the aliens need not be released. But in that case the Chinese crew had come to the United States of their own volition; they could be excluded and deported because they had "departed" from China "destined" for the United States, even though their physical landing in custody of the police was not an "entry." Bradley, on the contrary, had never "departed" from foreign soil "destined" for the United States. This distinction does not mean that Bradley, if released, may stay here indefinitely; obviously, as an alien, he has no right to do so. However, when it is proposed to deport him to Norway, he is entitled to demand that the authorities shall be able to point to some statute which justifies his detention and deportation. For the reasons already stated, sections 153 and 154, upon which the respondent apparently relies, are inapplicable to an alien brought here as a prisoner of the Navy.

The second authority, Blumen v. Haff, 9 Cir., 78 F.2d 833, deals with aliens who voluntarily came to the United States in 1924 and remained here until October 1925 when they fled to England. In August 1926 they were brought back in custody of extradition officers to be tried for larceny committed during their residence in San Francisco between April 1924 and October 1925. They pleaded guilty to the indictment and served a prison sentence ending in June 1933. They were then arrested upon warrants of deportation which stated as ground therefor that they had been convicted of a crime involving moral turpitude committed prior to their entry in August 1926. These aliens originally entered the United States voluntarily and the case was considered as involving deportation, not exclusion proceedings. It has no resemblance to the

case at bar except for the fact that in August 1926 the aliens were brought back against their will by extradition. In so far as that was held to be an "entry," we respectfully disagree. Cf. United States ex rel. Ling Yee Suey v. Spar, 2 Cir., 149 F.2d 881, 883; United States ex rel. Consola v. Karnuth, D.C., W.D.N.Y., 25 F.Supp. 902.

The third authority, United States ex rel. Fitleberg v. McCandless, 3 Cir., 47 F.2d 683, 684, is equally remote. There the alien, prior to his arrest and extradition to Canada, had several times unlawfully entered the United States. Upon acquittal of the criminal charge, the Canadian authorites delivered him to immigration officers of the United States, who held him for deportation to England. He contended that since he was brought back to the United States forcibly and against his will he was not "found in the United States in violation of the United States immigration laws." In overruling this contention the court noted that the appellant was voluntarily and unlawfully here when arrested for extradition to Canada and remarked that "By returning him to this country, the Canadian officials put him back into the same status he occupied prior to his extradition."

██ No authority has been called to our attention, nor has independent investigation disclosed any, which deals with facts similar to those at bar. The theory that an alien can be seized on foreign soil by armed forces of the United States Navy, brought as a prisoner to our shores, turned over to the immigration authorities as being an "applicant for admission to the United States," held in custody by them for nearly six years, and then deported to the country of his nativity by virtue of the exclusion order savors of those very ideologies against which our nation has just fought the greatest war of history. The relator is entitled to be released from custody although he has no right to enter the United States. He is an experienced seaman and states through his counsel that he has no desire to enter the United States but wishes to ship out as a seaman on a foreign bound vessel. He has this privilege and it will rid the United States of an alien who has no right to remain here. We do not decide what action is open to remove him if he shall fail to make good this proposal. We do not wish to be understood as suggesting that there is no means forcibly to remove him, but only that the proceeding here taken is without jurisdiction.

The order is reversed and the cause remanded with directions to sustain the writ and discharge the relator.

AUGUSTUS N. HAND, Circuit Judge (dissenting).

I think the analysis of 8 U.S.C.A. § 203 in the prevailing opinion gives no assurance that upon the discharge of Bradley by the immigration authorities there will be any way of deporting him. It is most unlikely that a man arrested and brought to this country on a man-of-war of the United States can be ordered sent back on the vessel he came on like an immigrant unlawfully brought to our shores by a passenger vessel. Certainly statutory authority is lacking to fine the United States for thus bringing him here, or to order the United States Navy to carry him back. It is harder for me to believe that an alien—who concededly has no right to stay here—cannot be removed, than to believe that he can be removed under the immigration statute because he is within the definition of 8 U.S.C.A. § 203 which describes an immigrant as "any alien departing from any place outside the United States destined for the United States."

Bradley literally "departed" from Greenland when he was transported from that country; likewise he was "destined for the United States" when he left Greenland for America.

The majority opinion treats the definition of "immigrant" given in 8 U.S.C.A. § 203 as presupposing a voluntary departure of an alien from foreign country with the intention of entering the United States as his terminus ad quem, and cites as authority the decision of the Ninth Circuit in Moffitt v. United States, 128 F. 375 381, which construed the term "alien immigrant," used in the Act of March 3, 1891, c. 551, 26 Stat. 1084, as referring only to aliens who leave a foreign shore "to come to the United States for the purpose of becoming a permanent resident here." But that decision

was made in the absence of any congressional definition of the term "immigrant" and was based on a standard dictionary meaning of the word which it was presumed Congress intended to apply. It is, however, now clear that Congress has since displaced that judicial interpretation of the word "immigrant" by its own definition, which is much broader in language and limited only by specific exceptions set forth. The statutory definition first appeared in the Act of May 26, 1924, c. 190, § 3, 43 Stat. 154, and has been retained unchanged in subsequent reenactments. 8 U.S.C.A. § 203. Because of the breadth of the statutory definition, Congress has deemed it necessary specifically to except such persons as bona fide alien seamen serving as such on vessels visiting our seaports. It would have been completely unnecessary to make any such exception to its definition of "immigrant" if that basic definition were no broader than the one used by the court in Moffitt v. United States, 9 Cir., 128 F. 375, and other early decisions there cited. See e. g., United States v. Sandrey, C.C., E.D.La., 1891, 48 F. 550, 552, 553.

It is now asserted that in United States ex rel. Ling Yee Suey v. Spar, 2 Cir., 149 F.2d 881, the Chinese crew members had come to the United States of their own volition and hence might be said to have "departed" from China "destined" for the United States, even though their physical landing in custody of the police was not an "entry." But those Chinese sailors were aboard a British vessel which had arrived at the Port of New York from Singapore and was apparently scheduled to return, with its Chinese crew members, to the latter port. It is difficult for me to see how the United States there—any more than in the present case—was the terminus ad quem which the aliens had set for themselves for the purpose of becoming permanent residents here, even though at the outset of their voyage from Singapore they may have known that the vessel was due to put in at New York as a port of call during its voyage. In other words, our decision in United States ex rel. Ling Yee Suey v. Spar, supra, filed in June, 1945, necessarily assumed that the statutory definition of "immigrant" first enacted in 1924 superseded the pre-1924 judicial interpretation of the term made in such decisions as Moffitt v. United States, which the majority opinion here cites with approval. Accordingly, there was no less of a departure, "destined for the United States," in the case at bar than in that of Ling Yee Suey, and the petitioner here is no more entitled to enter the United States without a quota immigration visa than were the petitioners in that case.

In United States ex rel. Von Kleczkowski v. Watkins, D.C., 71 F.Supp. 429, April 22, 1947, Judge Rifkind was faced with the contention that two enemy aliens brought into the United States involuntarily by the government were not subject to the immigration law and thought the point so clearly settled against them by the present immigration statute that he disposed of it by citing United States ex rel. Ling Yee Suey v. Spar, 2 Cir., 149 F.2d 881, and nothing more.

It seems to me that the engrafting of a new implied exception into the immigration statutes is likely to give rise to serious future troubles in the interpretation of a mass of statutes that are already difficult and confusing. It may be argued that the situation here presented is unusual and unlikely to recur, but I cannot foresee how many aliens of the sort we have to deal with here may be at large in this country and have more concern lest the decision of the majority should leave the executive without any power either to intern or deport such persons than I have that the latter may be subjected to a somewhat new application of a statute that is broad enough in its terms to include them. I think the order dismissing the writ of habeas corpus should be affirmed.