DELAWARE, L. & W. R. CO. v. STEVENS et al., Public Service Com'rs.

(Circuit Court, N. D. New York. September 17, 1909.)

1. RAILROADS (§ 9*)—REGULATION—PUBLIC SERVICE COMMISSION—ORDERS—INJUNCTION—CONDITIONS PRECEDENT—APPLICATION FOR REHEARING.

Where a carrier, within the time fixed by an order requiring interstate trains to stop at D., asked for a reconsideration, and, being requested to put the application in writing, did so by a formal letter to the commission, asking modification of the order in certain particulars, and the commission considered the request and denied the modification, the objection to the carrier's bill to restrain the enforcement of the order that it should first have applied for rehearing was untenable.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 12–19; Dec. Dig. § 9.*]

**2. CONSTITUTIONAL LAW (§ 43*)—OBJECTION—WAIVER.**

Where a complaint before the Public Service Commission against an interstate carrier prayed an order requiring defendant to operate passenger trains which would afford service for the residents of D. north and south bound at or about the same time of day that was formerly afforded by two trains known as Nos. 9 and 12, which no longer stopped there, and for further relief, but nowhere prayed that the commission order trains 9 and 12 to again stop at D., the railroad's failure to plead and prove that to stop such trains, as required by the commission's subsequent order, would interfere with interstate commerce, the carrying of United States mails, and would confiscate the railroad company's property, in violation of state and federal Constitutions, did not constitute a waiver of such objections.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. § 41; Dec. Dig. § 43.*]

**3. CONSTITUTIONAL LAW (§ 70*) — PUBLIC SERVICE COMMISSION — REVIEW BY COURTS.**

State courts in reviewing orders of the Public Service Commission act judicially, and not legislatively.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. §§ 129–132; Dec. Dig. § 70.*]

**4. COMMERCE (§ 8*)—INTERSTATE COMMERCE—REGULATION.**

Congress, having been given sole jurisdiction over, and the right to regulate, interstate commerce, and having created the Interstate Commerce Commission as a tribunal for that purpose, the states have no power or jurisdiction to directly interfere with or directly regulate the same by Public Service Commissions or otherwise.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. § 5; Dec. Dig. § 8.*]

**5. COMMERCE (§ 8*) — INTERSTATE COMMERCE — REGULATION—PUBLIC SERVICE COMMISSION—ORDERS.**

An order of a Public Service Commission directly interfering with or directly regulating interstate commerce is not merely erroneous, but is absolutely void.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. § 5; Dec. Dig. § 8.*]

**6. COMMERCE (§ 58*)—REGULATION—RAILROADS—STATE COMMISSION.**

A Public Service Commission may compel an interstate railroad to put on additional trains in certain cases, as well as companies operating wholly within the state.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. §§ 77–81; Dec. Dig. § 58.*]

**7. CORPORATIONS (§ 394*)—REGULATION—PUBLIC SERVICE COMMISSION—ORDERS—APPEAL.**

The act creating the Public Service Commission and defining its powers does not give any right of appeal to any other body or court with power to substitute its order or judgment for that of the commission.

[Ed. Note.—For other cases, see Corporations, Dec. Dig. § 394.*]

**8. RAILROADS (§ 9*)—PUBLIC SERVICE COMMISSION—ORDERS—REVIEW ON CERTIORARI.**

Code Civ. Proc. N. Y. § 2120, provides that certiorari is issued to review the determination of a body or officers only where the right to the writ is expressly conferred or authorized by statute, and, where the writ may be issued at common law, by a court of general jurisdiction, and the

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

right to the writ or the court's power to issue it is not expressly taken away by statute. *Held,* that certiorari was not available to review an order of the Public Service Commission requiring certain interstate trains to stop at a specified station.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 12-19; Dec. Dig. § 9.*]

9. RAILROADS (§ 9*)—REGULATION—PUBLIC SERVICE COMMISSION—NATURE OF ACTS.

Where the Public Service Commission, on complaint after hearing and the taking of evidence, entered an order requiring that complainants stop certain of its interstate trains at a station, the commission's act was legislative, and not judicial.

[Ed. Note.—For other cases, see Railroads, Dec. Dig. § 9.*]

10. RAILROADS (§ 9*)—PUBLIC SERVICE COMMISSION—FEDERAL COURTS—JURISDICTION.

Where an order of the New York Public Service Commission, requiring interstate trains to stop at a station, was complete with the denial of the railroad company's application to modify the order, the requisite jurisdictional facts being present, the railroad company was not bound to apply to the state courts for relief before filing a bill in the federal court to restrain the operation of the order, being entitled to select, at will, any tribunal having jurisdiction of the parties and subject-matter.

[Ed. Note.—For other cases, see Railroads, Dec. Dig. § 9.*]

11. RAILROADS (§ 9*)—PUBLIC SERVICE COMMISSION—ORDER—CONCLUSIVENESS.

An order of the Public Service Commission directing a railroad company to stop two of its interstate trains at D., being legislative in character, was not res judicata, and hence the railroad company's failure to object at the hearing, before the commission, that such an order would be unconstitutional and an unwarranted interference with interstate commerce, did not estop the railroad company from insisting thereon as a basis of a bill to restrain the enforcement of the order.

[Ed. Note.—For other cases, see Railroads, Dec. Dig. § 9.*]

12. CONSTITUTIONAL LAW (§ 73*)—LEGISLATIVE ACTS—PUBLIC SERVICE COMMISSION—ORDERS—INJUNCTION.

Where the Public Service Commission or other body possessing legislative authority with executive power to put its acts into effect enacts an unconstitutional rule or order, it may be enjoined by the courts from enforcing it.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. § 19; Dec. Dig. § 73.*]

Bill by the Delaware, Lackawanna & Western Railroad Company against Frank W. Stevens and others, constituting the Public Service Commission of the Second District of the state of New York. Defendants' amended plea to the bill overruled.

Hearing on amended plea to bill of complaint which seeks, pending the suit, an order suspending an order of the Public Service Commission, Second District, of the state of New York, made September 17, 1908, and enjoining and restraining proceedings thereunder, and praying a final decree setting aside and annulling such order and perpetually enjoining proceedings thereunder and for general relief.

F. W. Thomson (W. S. Jenney, of counsel), for complainant.
Ledyard P. Hale, for defendants.

RAY, District Judge. The Public Service Commission of the state of New York was created by the statutes of the state with the powers and jurisdiction hereafter referred to. The Delaware, Lackawanna & Western Railroad Company is a railroad and public service corporation organized under and pursuant to the laws of the state of Pennsylvania, but owns, leases, and operates railroad lines in New Jersey, Pennsylvania, and the state of New York, amongst others a trunk line extending from Jersey City, state of New Jersey, through and across New Jersey, the eastern part of Pennsylvania, and the southern-central and western part of the state of New York, terminating at Buffalo, N. Y., where it has other connections extending into or through some of the states of the Middle West. It carries and transports express, United States mails, freight and passengers with their baggage, and does an extended and immense interstate trade and commerce business. By local, so-called, trains and others it does an interstate business between New Jersey and Pennsylvania, and Pennsylvania and New York. It also has trains and does an intrastate business in such transportation wholly in the state of New York. It has local trains and also through trains stopping only occasionally for fuel and water or to accommodate passengers from the great centers. In respect to the intrastate transportation wholly in the state of New York, the bill alleges that it is subject to the provisions of chapter 429, p. 889, Laws 1907, of the state of New York, except in so far as they may be repugnant to and invalid by the provisions of the Constitutions of the United States and the state of New York. The bill also alleges:

"Your orator further says: That it is now lawfully operating, and for many years last past has lawfully operated, a main trunk line of double-tracked railway, extending from Hoboken, N. J., in a northwesterly direction, through the states of New Jersey, Pennsylvania, and New York, via Paterson, N. J., Dover, N. J., Scranton, Pa., Binghamton, Elmira, and Owego, N. Y., to Buffalo, in the state of New York. That said line of railroad constitutes one of the principal arteries, through which ebbs and flows an immense interstate commerce—the interstate transportation of passengers and property from Buffalo and points west thereof to the seaboard. That upon said trunk line of railway the complainant has installed and for many years last past maintained and operated, and is still maintaining and operating, a fast through interstate passenger service from Hoboken to Buffalo, and with its connecting lines, to Chicago, and other points in the West, and from Buffalo, and, with its connecting lines, from Chicago and other points in the West, to Hoboken. That trains Nos. 9 and 12 hereinafter referred to are, among others, employed in such through service. That said trains are specially designed and equipped for such service, and the great bulk of the business thereof consists of such through interstate travel. That said train No. 9, which is a west-bound train, is obliged to run at a high rate of speed in order to make connections at Buffalo with lines running to points west thereof. That the east-bound trains performing such through service, including No. 12 hereinafter referred to, are companion or return trains, making equally fast or nearly as fast schedule time. That complainant's said line of railroad from Dover, N. J., through New Jersey and Pennsylvania, to the New York state line, passes through a rough, mountainous country, and surmounts between Stroudsburg and Scranton in each direction a grade of eighty (80) feet per mile. Taking into consideration said facts, and the fact that trains are peculiarly subject to delay while traversing such country, especially in winter seasons, the running time of said trains cannot with safety be materially reduced. That, in order to maintain the necessary schedules for the operation of said interstate trains, it is impossible and wholly impracticable to stop at all stations, and that said

trains only stop regularly at junction points and at such points of importance which are necessary and which justify said stops."

The bill also sets out the stops of interstate trains Nos. 9 and 12, and the reasons and necessity therefor. No stop of either of the trains at Dansville, N. Y., is made or provided for. The bill also sets out the fact that in carrying United States mail under contract with the government and also passengers, etc., going to distant points, it is compelled to run these trains at a high rate of speed, and make as few stops as possible so as to make important and necessary connections. Dansville is a small village of about 3,500 inhabitants situated on complainant's railroad about 76 miles east of Buffalo. Since February 1, 1905, five passenger trains per day on complainant's road have stopped at Dansville going west to Buffalo, two in the morning and three in the afternoon, and five passenger trains have stopped per day at Dansville going east from Buffalo, three in the morning and two in the afternoon. The total number of passengers between Dansville and Buffalo in both directions for the year ending June 30, 1908, per month was 558, or 18.3 passengers per day, or an average of less than 2 passengers for each train. There is no commuter travel or travel by person obliged to be present in Buffalo on business or otherwise daily. This has been the business practically since February 1, 1895. Prior to the making of the order complained of, the board of trade of Dansville entered a complaint to the said Public Service Commission, alleging (1) that the inhabitants of the village had frequent occasion to travel from Dansville west to Buffalo and intermediate points and return, and east to Elmira and intermediate points and return; (2) that the arrangement of time schedules on the road of the Delaware, Lackawanna & Western Railroad Company for passenger trains between Buffalo and Elmira, Dansville being an intermediate point, was such that trains which stop at Dansville to take on or let off passengers do not afford to the residents of such village adequate and convenient service; also (3) that formerly it was the practice of the company to afford to Dansville the daily service and accommodation of interstate passenger train No. 9 bound for Buffalo leaving Dansville at about 6 a. m., and reaching Buffalo at 7:45 a. m., whereas now the only morning passenger train to Buffalo, No. 7, leaves at the inconvenient hour of 4:42 a. m. and reaches Buffalo at 7 a. m.; also (4) that formerly it was the practice of the company to afford to the citizens of Dansville the daily service and accommodation of the interstate passenger train No. 12 south-bound to Elmira leaving Dansville at 10:30 p. m., and reaching Elmira at 12:12 midnight, while at the present time the only south-bound passenger service after 7:16 p. m. is by train 14, leaving Dansville at 1:20 a. m. and reaching Elmira at 3:04 a. m. The complainant alleged the interstate character and business of these trains. The complainant also stated:

"That the withdrawal of the former service afforded by the trains Nos. 9 and 12, as aforesaid, is unjust, unreasonable, and discriminatory, and works great hardship and loss upon the residents of Dansville, and that the stops of said trains at Dansville should be restored or corresponding independent service should be provided. That, by reason of the premises, defendant has been and is subjecting complainant and the residents of Dansville, N. Y., to undue and unreasonable prejudice and disadvantage and unjust discrimination, and

depriving residents of Dansville of reasonable and adequate train service, in violation of the provisions of the Public Service Commissions law, chapter 429, p. 889, of the Laws of 1907 of the state of New York."

The relief demanded was:

"Wherefore complainant prays that the defendant be required to promptly answer the charges herein; that, after due hearing and investigation, an order be made commanding said defendant to wholly cease and desist from the aforesaid violation of the provisions of said law, and to the full extent thereof; that a further order be issued requiring said defendant to operate passenger trains which shall afford service for the residents of Dansville, north-bound and south-bound, at or about the same time of day that was formerly afforded by the trains designated as Nos. 9 and 12, aforesaid, and that such other and further order or orders may be entered as the commission may deem necessary in the premises and the complainant's cause may appear to require."

To this complaint the railroad company answered (1) that the residents of Dansville had occasion to travel by rail from Dansville to Buffalo westward and eastward to Elmira. It then set out the present train service in detail, showing passenger trains leaving Dansville for Buffalo and Elmira, and from those parts to Dansville as follows:

West-Bound:

| Train # 15 leaves Dansville | 11:13 a. m. | Arrives Buffalo | 1:05 p. m. |
|---|---|---|---|
| Train # 27 leaves " | 3:27 p. m. | Arrives Buffalo | 6:00 p. m. |
| Train # 3 leaves " | 6:14 p. m. | Arrives Buffalo | 7:58 p. m. |
| Train # 5 leaves " | 11:48 p. m. | Arrives Buffalo | 1:45 a. m. |
| Train # 7 leaves " | 4:42 a. m. | Arrives Buffalo | 7:00 a. m. |

East-Bound.

| Train # 2 leaves Buffalo | 3:15 a. m. | Arrives Dansville | 5:15 a. m. |
|---|---|---|---|
| Train # 28 leaves " | 8:00 a. m. | Arrives " | 10:20 a. m. |
| Train # 6 leaves " | 9:30 a. m. | Arrives " | 11:15 a. m. |
| Train # 8 leaves " | 5:30 p. m. | Arrives " | 7:26 p. m. |
| Train # 14 leaves " | 11:30 p. m. | Arrives " | 1:20 a. m. |

*    *    *    *    *    *    *    *    *    *    *    *

East-Bound.

| Train # 6 leaves Dansville | 11:15 a. m. | Arrives Elmira | 12:48 noon |
|---|---|---|---|
| Train # 28 leaves " | 10:20 a. m. | Arrives Elmira | 3:30 p. m. |
| Train # 8 leaves " | 7:26 p. m. | Arrives Elmira | 9:47 p. m. |
| Train # 14 leaves " | 1:20 a. m. | Arrives Elmira | 3:04 a. m. |

West-Bound.

| Train # 15 leaves Elmira | 9:26 a. m. | Arrives Dansville | 11:13 a. m. |
|---|---|---|---|
| Train # 27 leaves Elmira | 1:15 p. m. | Arrives Dansville | 3:27 p. m. |
| Train # 3 leaves Elmira | 4:45 p. m. | Arrives Dansville | 6:14 p. m. |
| Train # 5 leaves Elmira | 10:12 p. m. | Arrives Dansville | 11:48 p. m. |
| Train # 7 leaves Elmira | 2:45 a. m. | Arrives Dansville | 4:42 a. m. |

It also set forth the daily passenger travel on all these trains from Dansville to Buffalo and beyond, and intermediate points, and from Dansville to Elmira and beyond, and intermediate points. The answer denied that it did not furnish adequate service for the people of Dansville. The complaint of the board of trade states that trains 9 and 12 are interstate trains, but did not ask that the company be ordered to stop either train at Dansville. Neither answer nor proof was required to establish that fact before the Public Service Commission. The commission stood informed of it by allegation and want of denial.

The bill of complaint here states that prior to February 1, 1905, trains 9 and 12 had been accustomed to stop at Dansville and other points of about the same importance, but it was found that these trains

were frequently late at junction and terminal points, and it was also found that, to meet the exigencies of its interstate business and the demands and requirements of modern commerce and passenger transportation, it was necessary to eliminate some of the less important stops which these trains had been making, and accordingly this was done as to several points named, Dansville being among the number; also, that there is no turntable at Dansville or other facilities which can be used for making up trains at Dansville to run from or to that place as a terminal. The bill also alleges that to stop such trains at Dansville and like stations would render it impossible to make schedule time; that fines for delay in carrying the mails would be exacted, mail contracts withdrawn, and that said trains would have to be abandoned as through fast trains; also, that frequent stops impair its service as compared with its competitors, and would result in great financial loss. The alleged unreasonableness and unconstitutionality of the order complained of is also set forth. The bill also sets forth the impossibility of installing and operating local trains from Dansville to Buffalo without great loss, amounting to about $65 per day on each train. In short, the bill of complaint here alleges in substance that the enforcement of the order will result practically in the confiscation of complainant's property for the alleged convenience of a very few people in Dansville. After a hearing on the complaint of the board of trade and answer thereto, the commission made the order complained of, which so far as material reads as follows:

"Now, upon the aforesaid complaint, answer, reply, and evidence at the hearings, and after due deliberation, and it appearing that the passenger train service now given by said company at its Dansville station is unjust, unreasonable, and inadequate, in that the said company fails to give a just, reasonable, and adequate passenger train service from Dansville westward to Buffalo between the hours of 5 o'clock and 11 o'clock in the forenoon, and from Buffalo eastward to Dansville between the hours of 6 o'clock and 11 o'clock in the afternoon, it is

"Ordered: (1) That such just, reasonable, and adequate service be given at said Dansville station by said the Delaware, Lackawanna & Western Railroad Company by regularly stopping thereat its west-bound train known as train No. 9, which now passes said station at approximately 6 o'clock in the morning, and by stopping upon signal or request to receive or discharge passengers at the said station its east-bound train known as No. 12, which now passes said station at approximately half past 10 o'clock in the afternoon.

"Ordered: (2) That the said the Delaware, Lackawanna & Western Railroad Company may at its option omit stopping the said trains 9 and 12 at Dansville upon condition that it provides and operates a regular passenger train with suitable and adequate accommodations which shall leave Dansville for Buffalo each day, except Sundays, not earlier than 6 o'clock nor later than 7 o'clock in the morning, and run to Buffalo upon a time schedule of approximately two hours, and another such regular passenger train with suitable and adequate accommodations which shall leave Buffalo each day, except Sundays, not earlier than 8 o'clock nor later than 9 o'clock in the evening, and run to Dansville upon a time schedule of approximately two hours, the said trains to be placed in service on the 30th day of November, 1908, and their operation to be continued until the further order of this commission."

The complaint to the commission, the answer of the company, and its order are all attached to the bill of complaint, and by reference made a part of the amended plea. Attached to the defendants' amended plea herein is a copy of the evidence given before the commission.

The substance of defendants' amended plea is as follows:

"That neither by its answer to the petition, nor by written or oral objection, nor by oral or documentary evidence, nor by argument, oral or written, or otherwise, did the said railroad company make any claim that the commission was without jurisdiction to make an order requiring trains No. 9 and No. 12 to stop at Dansville because so to do would be in violation of the Constitution or laws of the United States as an unreasonable or unlawful interference with interstate commerce or with the transportation of the United States mails; that neither by its said answer to the petition, nor by written or oral objection, nor by documentary or other evidence, nor by argument, oral or written or otherwise, did the said railroad company make any claim that the commission was without jurisdiction to make an order requiring that new local trains from Dansville to Buffalo and return should be put on if the said railroad company elected not to stop said trains No. 9 and No. 12 at Dansville; that the said railroad company has not applied to the commission for a rehearing in respect to any matter determined in said order Exhibit C; that the determination of the question of the adequacy and reasonableness of the train service furnished by the complainant herein between Dansville and Buffalo was legislative in character, and defendants' jurisdiction, powers, and duties in respect thereto under said Public Service Commissions law were legislative in character; that the said railroad company might as a matter of right have applied to these defendants as such commission for a rehearing in respect to the matters, and each matter determined in said order complained of in this suit, and may yet as a matter of right so apply; that said railroad company, complainant herein, ought not as a matter of equity or right to be allowed to maintain its said bill in equity herein because of its said failure either to allege or claim before said commission that said commission might not order said trains No. 9 and No. 12 to stop at Dansville because such order would be in contravention of the Constitution and laws of the United States as an unwarranted and unreasonable interference with interstate commerce or the transportation of the mails, and because of its said failure to apply for a rehearing under said section 22 of the Public Service Commissions law; all of which matters and things these defendants aver to be true, and they plead the same to the whole of said complainant's bill as aforesaid, and pray the judgment of this honorable court whether they ought to be required to make any other or further answer to the said bill, and pray to be hence dismissed, with their costs and charges in that behalf most wrongfully sustained."

The allegation of the amended plea that the defendant in that proceeding, the complainant in this suit, did not apply for a rehearing, is in my judgment fully met and answered by a stipulation modifying the plea from which it fully appears that within the time fixed by the order of the commission the railroad company did orally ask for a reconsideration; that it was requested to put the request in writing, which it did by a formal and explicit letter to the commission asking a modification of the order in certain particulars; that the commission considered the request, and then denied, refused, the modification of the order. It was not necessary to give more evidence, as the company stood on that given before the commission. It asked a reconsideration of the whole subject and a modification of the order, which request was entertained by the commission, and, after consideration, the modification was refused and notice given. Thereupon, and on the day the order took effect, this suit was instituted. It stands admitted that the Public Service Commission of the State of New York, Second Division, made and was about to enforce an order requiring the Delaware, Lackawanna & Western Railroad Company to stop one through interstate train running from Jersey City, N. J., to Buffalo, N. Y., carrying the mails of the United States and interstate passen-

gers, at Dansville, N. Y., under the circumstances and conditions stated in the bill, and that it made and was about to enforce an order requiring said company under the circumstances and conditions named to stop on signal another interstate train carrying United States mails and interstate passengers at Dansville. It is conceded that the benefits derived by or accruing to the people of Dansville are as stated, and that the damages and detriment to the company and impracticability of a compliance are as set out in the bill. There is nothing in the amended plea to modify or ameliorate the conditions and results alleged. The whole substance of the plea is that the defendant there, complainant here, did not plead and prove that to stop such trains as required by the order would interfere with interstate trains and the carrying of United States mails, and that available remedies in the courts of the state of New York have not been resorted to and exhausted; that it did not plead in its answer that such an order was confiscatory or in contravention and violation of the Constitutions of the state of New York and of the United States, etc. But how can it be contended that the defendant there, this railroad company, was bound to plead any such defense when there was no suggestion in the complaint made and relief demanded that such an order was or would be asked for, or would be made by the commission if no defense was interposed? Was the company to presume that the commission would make an order interfering with and crippling its interstate business and the carrying of the United States mails and inflicting great pecuniary damage? It is true that the complaint of the board of trade of Dansville stated that the stops of said trains 9 and 12 should be restored or corresponding independent service provided, but in the demand for relief this was not asked or demanded even by implication.

It is also contended that the defendant there, complainant here, should have sought a review of the action of the commission by certiorari or otherwise in the state courts before resorting to the federal court; that the proceedings before the commission and its determination were legislative in character, and, while they may be reviewed in the courts, the legislative action is not complete until the courts of the state have passed on the question; that resort should not be had to a bill in equity until all these remedies are exhausted. This assumes that, if there may be a review of the action of the commission by the state courts, such courts are acting legislatively, and not judicially. But I fail to find any statute conferring legislative powers on the courts of the state of New York as to these matters. I am not pointed to any decision so holding or to any statute giving the power, and fail to find any. Counsel for the defendants here cites the court to and relies largely upon Prentis v. Atlantic Coast Line, 211 U. S. 210, 223, 226–230, 29 Sup. Ct. 67, 53 L. Ed. 150; Honolulu v. Hawaii, 211 U. S. 282, 291, 29 Sup. Ct. 55, 53 L. Ed. 186; Knoxville v. Water Co., 212 U. S. 1, 8, 18, 29 Sup. Ct. 148, 53 L. Ed. 371; Willcox v. Consolidated Gas Co., 212 U. S. 19, 40, 29 Sup. Ct. 192, 53 L. Ed. 382. It safely may be assumed, I think, that the Constitution of the United States having given to the Congress of the United States sole jurisdiction over and to regulate interstate and foreign commerce, and having created a tribunal, the Interstate Commerce Commission, to regulate

same, etc., the state has no power or jurisdiction to directly interfere with or directly regulate same by its Public Service Commission or otherwise. Atlantic Coast Line R. R. Co. v. Wharton et al., 207 U. S. 331, 334, 28 Sup. Ct. 121, 52 L. Ed. 230, and cases there referred to. Any order made by the Public Service Commission which does this is not merely erroneous, but obviously void. Same case. It is also decided that some orders of such commissions "which cause" a stoppage of interstate trains, but which do not directly regulate such commerce, may be valid. Lake Shore & M. S. R. Co. v. Ohio, 173 U. S. 285, 19 Sup. Ct. 465, 43 L. Ed. 702. In that case the statute of the state of Ohio relating to railroad companies in that state required such companies to stop three trains each way, if so many were run carrying passengers, at every village of over 3,000 population, for a sufficient time to let passengers on and off, and imposed a penalty for a failure to make such stops in such cases. The defendant company there was incorporated under the laws of the state of Ohio, and again the statute was not aimed at or directed against interstate trains or any particular train. The order of the commission in the case at bar was aimed at and applied directly to two interstate fast trains and known to the commission to be such. It is a question whether this is not a direct interference with interstate commerce. But it is not now necessary to decide that question.

In Atlantic Coast Line R. Co. v. North Carolina Corporation Commission, 206 U. S. 1, 27 Sup. Ct. 585, 51 L. Ed. 933, it seems to be decided that the state commission may compel the putting on of additional trains in certain cases and under certain conditions. This undoubtedly applies to all companies operating in the state.

In Honolulu R. T. Co. v. Hawaii, 211 U. S. 282, 29 Sup. Ct. 55, 53 L. Ed. 186, it is held that:

"The power to regulate the operation of railroads includes regulation of the schedule for running trains, that such power is legislative in character, and the Legislature itself may exercise it or may delegate its execution in detail to an administrative body, and, where the Legislature has so delegated such regulation, the power of regulation cannot be exercised by the courts."

It was accordingly held that the courts could not independently regulate the schedule for running trains without deciding whether or not the courts had power to review the action of the administrative officers. This case is not to be construed as a holding that a state commission may directly control and direct the running or schedule time of interstate trains. If so construed it would be in direct conflict with Atlantic Coast Line R. R. Co. v. Wharton et al., 207 U. S. 331, 334, 28 Sup. Ct. 121, 52 L. Ed. 230, and cases there cited.

In Prentis v. Atlantic Coast Line, 211 U. S. 210, 224, 227, 29 Sup. Ct. 67, 70, 53 L. Ed. 150, the court held that the state had directly and expressly given a right of appeal from the State Corporation Commission to the Supreme Court of Appeals, with power to substitute such order as in its opinion the commission should have made. It also held that the court on such appeal would have been acting legislatively, and not judicially. The court said:

"If an order is passed, the order again is to be published as above before it shall go into effect. An appeal to the Supreme Court of Appeals is given of

right to any party aggrieved upon conditions not necessary to be stated, and that court, if it reverses what has been done, is to substitute such order as in its opinion the commission should have made. The commission is to certify the facts upon which its action was based and such evidence as may be required, but no new evidence is to be received, and how far the findings of the commission can be revised perhaps is not quite plain. No other court of the state can review, reverse, correct, or annul the action of the commission, and in collateral proceedings the validity of the rates established by it cannot be called in doubt. * * * The nature of the final act determines the nature of the previous inquiry. As the judge is bound to declare the law, he must know or discover the facts that establish the law. So, when the final act is legislative, the decision which induces it cannot be judicial in the practical sense, although the questions considered might be the same that would arise in the trial of a case. If a state Constitution should provide for a hearing before any law should be passed, and should declare that it should be a judicial proceeding in rem and the decision binding upon all the world, it hardly is to be supposed that the simple device could make the constitutionality of the law res judicata, if it subsequently should be drawn in question before a court of the United States. And all that we have said would be equally true if an appeal had been taken to the Supreme Court of Appeals and it had confirmed the rate. Its action in doing so would not have been judicial, although the questions debated by it might have been the same that might come before it as a court, and would have been discussed and passed upon by it in the same way that it would deal with them if they arose afterwards in a case properly so called. We gather that these are the views of the Supreme Court of Appeals itself. *Atlantic Coast Line Ry. Co. v. Commonwealth,* 102 Va. 599, 621, 46 S. E. 911. They are implied in many cases in this and other United States courts in which the enforcement of rates has been enjoined, notwithstanding notice and hearing, and what counsel in this case call litigation in advance. Legislation cannot bolster itself up in that way. Litigation cannot arise until the moment of legislation is past. See *Southern Ry. Co. v. Commonwealth,* 107 Va. 771, 772, 60 S. E. 70, 17 L. R. A. (N. S.) 364."

But here there is no right of appeal given by the act creating the commission and defining its powers to any other body or to any court with power to substitute its judgment and order for that of the commission. It is a necessary consequence that the legislative act and function of the commission ended when its order was made and a modification thereof denied. No other body, or court, had power to legislate over the head of the commission or substitute its order for that of the commission. If under the provisions of Code Civ. Proc. N. Y. §§ 1901, 2120, 2122, 2140, the order could be reviewed by the appellate courts of the state, such action would be judicial, and not legislative. It would be an independent special proceeding or action judicial in its very nature. But it is not the judgment of a court, and no appeal is provided for.

I do not think this action of the Public Service Commission could have been or can be reviewed by certiorari. Such review is not given by special provision of law, and the writ does not lie to review the action of a board, body, or commission acting in a legislative capacity in the absence of such special provision of law. By section 2120, Code Civ. Proc., it is provided:

"Cases where certiorari may issue.

"The writ of certiorari regulated in this article, except the writ specified in section 2124 of this act, is issued to review the determination of a body or officer. It can be issued in one of the following cases only:

"(1) Where the right to the writ is expressly conferred, or the issue thereof is expressly authorized, by a statute.

"(2) Where the writ may be issued at common law, by a court of general jurisdiction, and the right to the writ, or the power of the court to issue it, is not expressly taken away by a statute."

In People ex rel. v. Board of Supervisors of Queens Co., N. Y., 131 N. Y. 468, 30 N. E. 488, the Court of Appeals held:

"The writ of certiorari is appropriate only to review the judicial action of inferior courts or public officers or bodies exercising judicial functions. It is not available to review the action of a public officer or body, which is merely legislative, executive or administrative, although it may involve the exercise of discretion."

In People ex rel. v. McWilliams et al., Constituting Civil Service Commission, 185 N. Y. 92, 77 N. E. 785, it was held:

"Classification by municipal civil service commission not reviewable by certiorari. The determination of a municipal civil service commission in classifying positions in the public service, although involving the exercise of judgment and discretion, is more of a legislative or executive character than judicial or quasi judicial, and therefore is not reviewable by certiorari."

The court in giving its opinion, per Chief Justice Cullen, said:

"It is a well-settled principle that the common-law writ of certiorari issues to review only the decisions of inferior judicial or quasi judicial tribunals. People ex rel. Copcutt v. Bd. of Health, 140 N. Y. 1, 35 N. E. 320, 23 L. R. A. 481, 37 Am. St. Rep. 522; People ex rel. Trustees of Jamaica v. Supervisors Queens Co., 131 N. Y. 468, 30 N. E. 488; People ex rel. O'Connor v. Supervisors Queens Co., 153 N. Y. 370, 47 N. E. 790. The question, therefore, is whether the action of the commissioners in classifying the relator's position in the civil service was judicial or quasi judicial. Here we must not be misled by names. The term 'judicial' is used in judicial literature, in opinions, and text books in. two distinctly different senses. The action of an administrative or executive officer or board may involve the exercise of judgment, and their action is quite often termed judicial. Thus in Mills v. City of Brooklyn, 32 N. Y. 489, it was held that the municipality was not liable for the insufficiency of a system of public sewers because the action of the municipal authorities in designing the system of sewerage was judicial. The word was here employed in an entirely different sense from that which is meant when we speak of judges as judicial officers, and the fact that public officers or agents exercise judgment and discretion in the performance of their duties does not make their action judicial in character so as to subject it to review by certiorari. People ex rel. Corwin v. Walter, 68 N. Y. 403; People ex rel. Second Ave. R. R. Co. v. Bd. of Commissioners, 97 N. Y. 37."

To the same effect is People ex rel. v. Department of Health, etc., 189 N. Y. 187, 82 N. E. 187, 13 L. R. A. (N. S.) 894, reversing 117 App. Div. 856, 103 N. Y. Supp. 275. See, also, to same effect. People ex rel. v. Van Alstyne, 53 App. Div. 1, 65 N. Y. Supp. 451; People ex rel. v. Maxwell, 123 App. Div. 591, 594, 108 N. Y. Supp. 49; People ex rel. v. Hubbell, 38 App. Div. 194, 56 N. Y. Supp. 642; People ex rel. v. Brady, 166 N. Y. 44, 59 N. E. 701; People ex rel. v. Featherstonhaugh, 172 N. Y. 112, 64 N. E. 802, 60 L. R. A. 318; People ex rel. v. Board of Health, 140 N. Y. 1, 35 N. E. 320, 23 L. R. A. 481, 37 Am. St. Rep. 522; People ex rel. v. Supervisors, etc., 153 N. Y. 370, 47 N. E. 790; People ex rel. v. Board of Supervisors, 113 App. Div. 773, 99 N. Y. Supp. 348—all to the same effect. The only case in the Court of Appeals of this state giving color to the contention that the proceedings of the Public Service Commission is reviewable by certiorari, that the acts of the commission are judicial, and not

legislative, is that of People ex rel. v. Board of Railroad Com., 160 N. Y. 202, 54 N. E. 697, decided by a divided court, four to three.

I am not prepared, as at present advised, to concur in any holding that a commission is a judicial or quasi judicial body, or that it acts judicially, and not legislatively, for the reason it hears evidence, considers, exercises its best judgment, and then decides what order it will make, and makes it accordingly if the final act is legislative. All legislative bodies are accustomed, if wise, to take evidence, consider it, and then decide what law it will enact. In so doing it acts in a legislative capacity. Its acts are legislative, and not judicial. On this point the language of the Supreme Court of the United States in Prentis v. Atlantic Coast Line, 211 U. S. 210, 226, 227, 29 Sup. Ct. 67, 69, 53 L. Ed. 150, is pointed and conclusive. It is there said among other things:

"And it does not matter what inquiries may have been made as a preliminary to the legislative act. Most legislation is preceded by hearings and investigations. But the effect of the inquiry and of the decision upon it is determined by the nature of the act to which the inquiry and decision lead up. * * * The nature of the final act determines the nature of the previous inquiry."

In this case it is the very contention of the defendants that the action and determination of the Public Service Commission were legislative, and not judicial. The cases cited from the Supreme Court of the United States settle the proposition that the acts of this commission were legislative, and not judicial or quasi judicial. In Honolulu R. T. Co. v. Hawaii, 211 U. S. 282, 29 Sup. Ct. 55, 53 L. Ed. 186, the court decided as already quoted:

"The power to regulate the operation of railroads includes regulation of the schedule for running trains. Such power is legislative in character, and the Legislature itself may exercise it or may delegate its execution in detail to an administrative body."

In Interstate Commerce Commission v. Railway Co., 167 U. S. 499, 17 Sup. Ct. 900, 42 L. Ed. 243, the court said:

"It is one thing to inquire whether the rates which have been charged and collected are reasonable—that is, a judicial act—but an entirely different thing to prescribe rates which shall be charged in the future; that is, a legislative act" (citing cases).

In Prentis v. Atlantic Coast Line, 211 U. S. 210, 29 Sup. Ct. 67, 53 L. Ed. 150, the court held:

"A judicial inquiry investigates, declares, and enforces liabilities as they stand on present or past facts and under existing laws, while legislation looks to the future and changes conditions, making new rules to be thereafter applied."

So here the Public Service Commission was called upon to act and to compel by investigation and determination what was just and reasonable for the company to do in the future, the service it should give, not to adjudge as to the propriety and reasonableness of what had been done, the service that had been afforded, and enforce liabilities for any violation of law. That was the act it was to perform, and the act it did perform, and it is the nature of the final act that determines whether the commission acted judicially or legislatively, wheth-

er its action was judicial or legislative. To hold otherwise would be to ignore the plain and repeated decisions of the Supreme Court of the United States. It is true that, as an incident to what it was to do, the act it was to require, the commission would very properly inquire as to the service being rendered, but its final act was not to condemn or punish for this if found inadequate. Whatever the commission found and decided in that respect was not the subject of any order, and could not affect the railroad company. The act it complains of is the fixing of a schedule for its two interstate fast trains, and the alternative of putting on other trains at a great loss amounting to confiscation.

It is urged, also, that the complainant company should not be permitted to come into the United States Circuit Court as it could sue or pursue a remedy in the courts of the state. If the legislative act was complete with the denial of the application to modify the order, and the day had come when the order of the commission was to go into effect, as it had, the complainant here had the right to go into the courts, and it had the right to select its tribunal, any tribunal having jurisdiction of the parties and subject-matter. The complainant is a nonresident of the state of New York, and hence there is the necessary diversity of citizenship to give this court jurisdiction and a federal question is also involved. In such case, as matter of equity and of law, the complainant may go directly to the federal courts, and is under no obligation to first test the questions in the state courts. The rule on this subject is well stated in Reagan v. Farmers' Trust & Loan Company, 154 U. S. 362, 14 Sup. Ct. 1047, 38 L. Ed. 1014, where it was held:

"A citizen of another state who feels himself aggrieved and injured by the rates prescribed by that commission may seek his remedy in equity against the commissioners in the Circuit Court of the United States in Texas, and the Circuit Court has jurisdiction over such a suit under the statutes regulating its general jurisdiction with the assent of Texas expressed in the act creating the commission."

And, where Mr. Justice Brewer in giving the opinion of the court, said:

"Nor can it be said in such a case that relief is obtainable only in the courts of the state; for it may be laid down as a general proposition that, whenever a citizen of a state can go into the courts of a state to defend his property against the illegal acts of its officers, a citizen of another state may invoke the jurisdiction of the federal courts to maintain a like defense. A state cannot tie up a citizen of another state, having property rights within its territory invaded by unauthorized acts of its own officers, to suits for redress in its own courts. Given a case where a suit can be maintained in the courts of the state to protect property rights, a citizen of another state may invoke the jurisdiction of the federal courts. Cowles v. Mercer County, 7 Wall. 118, 19 L. Ed. 86; Lincoln County v. Luning, 133 U. S. 529, 10 Sup. Ct. 363, 33 L. Ed. 766; Chicot County v. Sherwood, 148 U. S. 529, 13 Sup. Ct. 695, 37 L. Ed. 546."

As to what the court may do in such cases is well expressed in the same case at page 397 of 154 U. S., and page 1054 of 14 Sup. Ct. (38 L. Ed. 1014), where the court said:

"The courts are not authorized to revise or change the body of rates imposed by a Legislature or a commission. They do not determine whether one rate is preferable to another, or what under all circumstances would be fair and

reasonable as between the carriers and the shippers. They do not engage in any mere administrative work; but still there can be no doubt of their power and duty to inquire whether a body of rates prescribed by a legislature or a commission is unjust and unreasonable. and such as to work a practical destruction to rights of property, and, if found so to be, to restrain its operation."

This case is cited with approval and followed in Davis & Farnum Mfg. Co. v. Los Angeles, 189 U. S. 207, 218, 23 Sup. Ct. 498, 47 L. Ed. 778, and Ex parte Young, 209 U. S. 123, 144, 153, 28 Sup. Ct. 441, 451, 52 L. Ed. 714. 13 L. R. A. (N. S.) 932. In Ex parte Young, supra. the Reagan Case is commented on and the points decided stated. In Prentis v. Atlantic Coast Line, supra, at page 228 of 211 U. S., and page 70 of 29 Sup. Ct. (53 L. Ed. 150), the court, speaking on this subject, said, citing authority:

"A state cannot tie up a citizen of another state. having property within its territory invaded by unauthorized acts of its own officers, to suits for redress in its own courts."

I find nothing to the contrary of this rule, or which in any way modifies it in Prentis et al. v. Atlantic Coast Line, supra. There it was also held that the action of the State Railroad Commission was legislative. and not judicial; that an appeal to the Supreme Court from such legislative action was permitted; that the action of the court on such appeal was also legislative in its nature, as it had the right to consider the whole subject and substitute its own action and judgment and order for that of the commission; and that, while an action in equity in the courts will lie, it should not be instituted or proceeded with until the body—in that case the Supreme Court of the state— having the last legislative word had pronounced it. Such is not this case. Here, as already stated, the Public Service Commission had and gave the last word so far as legislation was concerned when it denied a modification of the order. The Supreme Court of the United States has applied the same principle in the Chinese cases holding that, where appeals from an immigration officer are not given directly to the courts of the United States, but are given to the Department of Commerce and Labor, the appeal to that department must be taken and decided before a resort is had to the courts. United States v. Sing Tuck, 194 U. S. 161, 24 Sup. Ct. 621, 48 L. Ed. 917. This, however, affords no basis for a contention that the constitutionality of a completed legislative act may not be tested in the federal court having jurisdiction in the first instance and without resort to a suit in the state court. It is urged that the complainant here, defendant before the Public Service Commission, has not treated the commission fairly; that it did not raise by answer or evidence or argument and press on the attention of the commission the fact that its action was unconstitutional as a direct regulation of interstate commerce, did not raise or press the question that its act in making such an order as it did make was confiscatory, etc.; that for this reason, because of this inequitable action or conduct on the part of the railroad company, it should not be permitted to maintain this action. If, for this reason, the railroad company cannot maintain this action in equity in the federal courts, it cannot maintain it or a like action in the state courts. To so decide would be to hold that the complainant is estopped from

maintaining its rights and defending its property from confiscation for the reason that the Public Service Commission, advised of the interstate character of these trains, on its own motion and on a complaint which asked no such order, made one assuming to regulate their time schedule and place of stoppage. I am not prepared to so hold. The Public Service Commission is to investigate and legislate; and, when it assumes to regulate the time schedules of fast interstate trains, it is bound first to investigate and ascertain whether or not its action will directly regulate interstate commerce or confiscate property. This was a legislative act; and an unconstitutional act of the Legislature or of any legislative body, whether directed against the public generally or against an individual, is no less unconstitutional and void for the reason that public notice was given and also notice to the individual and evidence taken and the public or the individual did not come before the legislative body and raise the constitutional questions. The acts of such a legislative body as the Public Service Commission are not res adjudicata, and cannot be made so in a suit by the person affected thereby brought in the courts. Prentis v. Atlantic Coast Line, 211 U. S. 210, 227, 29 Sup. Ct. 67, 53 L. Ed. 150; Reagan v. Farmers' Loan & Trust Company, 154 U. S. 362, 14 Sup. Ct. 1047, 38 L. Ed. 1014.

In Prentis v. Atlantic Coast Line, supra, the court held:

"The making of a rate by a legislative body, after hearing the interested parties, is not res judicata upon the validity of the rate when questioned by those parties in a suit in a court. Litigation does not arise until after legislation; nor can a state make such legislative action res judicata in subsequent litigation."

In giving the opinion of the court Mr. Justice Holmes, after stating what are judicial questions and what legislative, said:

"The decision upon them (legislative questions) cannot be res judicata when a suit is brought."

This to me is a self-evident proposition. The constitutionality of legislative acts may always be tested in the courts, even if the legislative body should assume to make them res judicata by express provision, and enact that they should not be tested in such tribunals. To hold otherwise would be to say that the Legislature may at will overthrow the Constitution.

It is too well settled to require extended comment or citation of authority that, when a commission or other body possessing delegated legislative authority with executive power to put its acts into effect enacts an unconstitutional or void law, or rule of action, it may be enjoined by the courts from enforcing it. Prentis v. Atlantic Coast Line, supra, 211 U. S. 230, 29 Sup. Ct. 71, 53 L. Ed. 150, and cases there cited; Ex parte Young, 209 U. S. 123, 155, 156, 28 Sup. Ct. 441, 452, 52 L. Ed. 714, 13 L. R. A. (N. S.) 932. In Ex parte Young, supra, the court says:

"The various authorities we have referred to furnish ample justification for the assertion that individuals, who, as officers of the state, are clothed with some duty in regard to the enforcement of the laws of the state, and who threaten and are about to commence proceedings, either of a civil or criminal

nature, to enforce against parties affected an unconstitutional act, violating the federal Constitution, may be enjoined by a federal court of equity from such action."

It follows that the plea must be overruled. So ordered.