**Ex parte DELANEY.**

No. 4591.

District Court, S. D. California, C. D.

Feb. 21, 1947.

David C. Marcus, of Los Angeles, Cal., for petitioner.

James M. Carter, U. S. Atty., Robert Wright, Asst. U. S. Atty., and Bruce G. Barber, Chief, Adjudications Div., U. S. Immigration and Naturalization Service, all of Los Angeles, Cal., for respondent.

J. F. T. O'CONNOR, District Judge.

John Delaney, also known as John Joseph Delaney, through his counsel, David Marcus, Esq., filed in this court on July 3rd, 1945, his petition for a writ of habeas corpus alleging:

(1) That he was detained, confined and restrained of his liberty, illegally, by the Department of Justice, Immigration and Naturalization Service, at Terminal Island, Los Angeles, California, District No. 16; and

(2) That he was a native-born American citizen born on or about the 14th day of November, 1898, at Brooklyn, New York. The petition for the writ of habeas corpus was granted, and made returnable in this court on July 9th, 1945.

The United States Department of Justice, Immigration and Naturalization Service, Los Angeles, California, District No.

314

16, respondent herein, through Albert Del Guercio, District Director, filed its return thereto, on July 7th, 1945, denying these allegations, to which there was a traverse, filed by petitioner on December 28th, 1946, to said return, and a supplemental return filed by respondent on December 20th, 1946. There was a hearing in court thereon, and thereupon the matter was taken under submission on briefs to be filed, which briefs have been filed and duly considered by the court.

*Two Issues in Case:*

This is an exclusion proceeding, as distinguished from a deportation proceeding;[1] and there are just two issues involved herein; namely

(1) When the petitioner, John Delaney, arrived at the Port of San Pedro, California, on May 20th, 1945, from a foreign country, namely Australia and other foreign ports, as a member of the crew of the vessel "Schenectady", a vessel in the Maritime Service of the United States serving in the capacity of second assistant engineer[2] did he, as a matter of law, make an entry (or reentry) into the United States as that word is defined in Sec. 19(a) of the Immigration Act of February 5, 1917,[3] assuming that he was an alien at that time; and

(2) Was John Delaney at that time an American citizen by jus soli, in fact and in law, or an alien immigrant not in possession of a valid immigration visa, as required by the Immigration Act of May 26, 1924, 8 U.S.C.A. §§ 166, 201 et seq., the Alien Registration Act of 1940, 8 U.S.C.A. §§ 155, 451 et seq., and Executive Order No. 8766, June 3, 1941.

There is no dispute about the fact that the SS. "Schenectady" went to Australia, the Persian Gulf, New Zealand, Philippine Islands and the Marshall Islands, and was in Curacao, Dutch West Indies and then went back through the Panama Canal to the Marshall and the Admiralty Islands and Ulithi, Caroline Islands, and returned to San Pedro and arrived therein on May 20th, 1945; and that John Delaney was in battle engagements in the Marshall Islands and in Ulithi. The departure crew list (supra) lists John Delaney as a United

---

[1] *Exclusion proceeding:* "Any alien seaman who shall land in a port of the United States contrary to the provisions of this subchapter shall be deemed to be unlawfully in the United States, and shall, at any time within three years thereafter, upon the warrant of the [Secretary of Labor], be taken into custody and brought before a board of special inquiry for examination as to his qualifications for admission to the United States, and if not admitted said alien seaman shall be deported at the expense of the appropriation provided in section 156 of this title." Act Feb. 5, 1917, c. 29, § 34, 39 Stat. 896, May 26, 1924, c. 190, § 19, 43 Stat. 165, 8 U.S.C.A. § 166.

[2] The departure crew list on file with the Service covering the departure of the "Schenectady" from the port of Los Angeles, California, on June 9th, 1944, describes the vessel as a tanker "owned and operated by Becon Hill Shipping Company, agents for War Shipping Administration", and that W. G. Friar is master of the said vessel. The crew list further recites that the vessel is bound foreign and lists among the "name of seamen", line 21, "John Delaney, capacity, Second Assistant Engineer." The War Shipping Administration was created by Executive Order of February 7, 1942, No. 9054, 7 F.R.No.28837, February 10, 1942; pursuant to the Act of June 6, 1941, c. 174, 55 Stat. 242, 50 U.S.C.A.Appendix, § 1271, and had transferred to it certain functions and duties of the United States Maritime Commission. (Gov. Brief page two.)

As a second engineer in the American Merchant Marine, John Delaney stated he held a reserve commission as a Lieutenant in the United States Navy. (From page 76 of the reopened hearing, dated September 18th, 1946).

[3] Sec. 19(a) of the Immigration Act of February 5, 1917, 39 Stat. 889, 8 U.S.C.A. § 155(a): " * * * Any alien who is hereafter sentenced to imprisonment for a term of one year or more because of conviction in this country of a crime involving moral turpitude, committed within five years after the entry of the alien to the United States * * * shall, upon the warrant of the [Attorney General], be taken into custody and deported. * * * In every case where any person is ordered deported from the United States under the provisions of this Act, or of any law or treaty, the decision of the [Attorney General] shall be final."

States citizen and the purpose of the voyage of the SS. "Schenectady" was to supply oil to the United States Navy.[4]

██ John Delaney testified at the hearing on his application for the writ of habeas corpus that, prior to this voyage, he took an oath of allegiance to the United States, in 1943, in joining the United States Maritime Service; that, while in the service of the United States Maritime Service, he was paid by the United States government; that his checks came from the United States Treasurer in Washington, D. C., during his entire service with the United States Maritime Service extending about a year and six months; that he did not make any voluntary trips from the United States; that the United States Coast Guard assigned him to the SS. "Schenectady" as engineer; that the Coast Guard was a part of the United States Navy; that the orders to go to sea came from the United States Coast Guard; and that the penalty for refusing to obey orders, in time of war, would be court martial.[5]

John Delaney further stated that, when the SS. "Schenectady" departed from the United States on June 10th, 1944, he intended to return to the United States, and that he remained on this vessel from June 10th, 1944, to May 20th, 1945. The court understands him to mean that he was not transferred to another vessel in the interim; and, while there is apparently no evidence in the record that John Delaney disembarked at any of these foreign ports, the court will assume that he did at every opportunity, although whether he did, or did not, would be immaterial for the purpose of this opinion, on the authority of United States ex rel. Roovers v. Kessler, 5 Cir., 90 F.2d 327, 328.[6]

Upon the return of the S.S. "Schenectady" at the port of San Pedro, California, on May 20th, 1945, John Delaney, as a member of the crew[7] had no passport and

---

[4] Lieutenant John Delaney was awarded the Atlantic War Zone Bar, the Mediterranean Middle East War Zone Bar, and the Pacific War Zone bar, confirming active service with the United States Merchant Marine in those war areas; as well as the Merchant Marine Combat Bar confirming active service with the United States Merchant Marine *in a ship which was engaged in direct enemy action*. (Petitioner's Exhibit No. 6.)

[5] The court will judicially notice that the functions of the War Shipping Administration were not a part of the powers and authority exercised by the United States Navy. Captain McKinney, Legal Officer, United States Naval Headquarters, Roosevelt Base, Terminal Island, advised that the United States Navy did not, during the present war, direct the departure of vessels operated under the authority of the War Shipping Administration, and that the Navy had no control or supervision over the personnel assigned to such vessels. (From Gov. brief p. 2.)

[6] "After having * * * been told by the immigration authorities at New Orleans (according to the testimony of the relator) that he would not alter his status if he shipped on a United States vessel and did not go ashore at any foreign part, he obtained employment as a seaman aboard the American steamship Santa Marta. In the course of the voyage the steamship touched at the foreign ports of Havana, Cuba, Cristobal, Canal Zone, and Puerto Cortez, Honduras. *Relator testified that he did not go ashore at any port, and the Government offered no controverting testimony.* * * * "

The court said: "We find nothing of substance in any of these points. United States ex rel. Claussen v. Day, 279 U.S. 398, 49 S.Ct. 354, 73 L.Ed. 758 and United States ex rel. Stapf v. Corsi, 287 U.S. 129, 53 S.Ct. 40, 77 L.Ed. 215, settle it that appellant made a new entry, and that his time for remaining in the United States ran from it. Appellant did leave the United States on board a ship; he did on board that ship enter foreign ports and foreign territory; and he did, on board the same ship, re-enter the United States. *That he did not betake himself ashore is immaterial.* United States v. Corsi, supra" (Italics supplied.) United States ex rel. Roovers v. Kessler, etc., 5 Cir., 90 F.2d 327, decided June 7th, 1937.

[7] The "Continuous Discharge Book, Department of Commerce, United States of America, No. 233972", in the name of John Delaney, records at page 4, line 2, that Mr. Delaney was engaged on June 6th, 1944, at San Pedro, in the rating of Second Assistant Engineer, showing the description of voyage as foreign, and date and place of discharge, May 23rd, 1945, San Pedro, signed by Master W. G. Friar. (From Gov. brief page 2.)

could not prove his citizenship, American or otherwise, to the satisfaction of the Immigration officers, and he was held for a Board of Special Inquiry to determine his nationality, although John Delaney had certain documentary evidence indicating his American nationality.[8]

*Exclusion proceedings:*

Although the Government has attached to its Return to Writ of Habeas Corpus exhibit A, which purports to be a copy of a directive to the owner, agent, Master, etc. of the SS. "Schenectady" for the delivery of John Delaney to the Immigration Station at Terminal Island for further examination, receipt of which notice is purported to have been acknowledged by the Master, W. G. Friar, at 10:15 A.M., May 20th, 1945, John Delaney gave the court to understand that when the vessel reached San Pedro, California, and docked there on May 20th, 1945, he left the ship and went to his home in Long Beach, California, the same day, and stayed there all night;[9] and the next day (May 21st, 1945) when he endeavored to return to the ship, he found it out in the harbor; and that upon calling up the shipping office at San Pedro, where the ship was, he was informed that he was to report to the Immigration Station, that being the following day (May 21st, 1945) after his arrival in the United States at San Pedro, California, giving the court to understand that up to this time he was absolutely unaware of the fact that the Immigration authorities wanted him. On the basis of John Delaney's testimony, he had entered the United States without any interception whatsoever, and, if this be a fact, he certainly must have entered the United States or technically have made a landing. There is no evidence that he tried to avoid his interception, and it would seem to the court that deportation proceedings, rather than exclusion proceedings, would have been the proper proceeding, although the court is not passing on this point in these proceedings. He further stated that he went to the Immigration office while in uniform, and the Immigration official thereupon took him into, and kept him in, custody for six weeks without permitting him to communicate with any one, until he was finally released on his application for a writ of habeas corpus, which his jailor at first refused to honor.

The Government, notwithstanding the fact that petitioner John Delaney was permitted to leave the vessel and remain at his home over night in Long Beach, California, takes the position that this proceeding is rightfully an exclusion proceeding, rather than a deportation proceeding, for the reason, obvious to the court, that in an exclusion proceeding involving the deportation of an alien for an unlawful entry, the burden is upon the alien to prove his citizenship (United States ex rel. Polymeris et al. v. Trudell, 1932, 284 U.S. 279, 52 S.Ct. 143, 76 L.Ed. 291); whereas in a deportation proceeding, where citizenship is claimed, the burden of proof is upon the Government to prove alienage. United States v. Sing Tuck et al., 1904, 194 U.S. 161, 24 S. Ct. 621, 48 L.Ed. 917.

█ The Government, in support of its contention that exclusion proceedings were proper, cites Sec. 15 of the Act of February 5, 1917, as amended, 39 Stat. 885, 8 U. S.C.A. § 151, providing in part as follows: "Section 15. That upon the arrival at a

---

[8] There was introduced into evidence at the hearing before the court, as Pet. Ex. 2, an identification card issued to John Delaney on March 6th, 1944, by a Lieutenant in the U. S. M. S., showing that John Delaney was a lieutenant in the U. S. Maritime Service, War Shipping Administration Training Organization; as Pet. Ex. 3, a certificate releasing John Delaney from active duty as a lieutenant in the U. S. Maritime Service, on March 25th, 1944, at San Francisco, and placing him in an inactive status in the U. S. Maritime Service; and his Continuous Discharge Book, issued to him by the U. S. Merchant Marine at Los Angeles, California, showing his place of birth New York on November 14th, 1898. (Nationality U. S. A. etc. Pet. Ex. 7.)

[9] Petitioner John Delaney contends that on May 20th, 1945, when said ship returned to the United States and docked in San Pedro, California, petitioner entered the United States and remained in Long Beach that day and all night, and was advised on May 21st, 1945, to report to the Immigration Office at San Pedro, hence that exclusion proceedings are too late.

port of the United States of any vessel bringing aliens it shall be the duty of the proper immigration officials to go or to send competent assistants to the vessel and there inspect all such aliens, or said immigration officials may order a temporary removal of such aliens for examination at a designated time and place, *but such temporary removal shall not be considered a landing * * *.*" (Italics supplied.) citing United States v. Ju Toy, 198 U.S. 253, 25 S.Ct. 644, 646, 49 L.Ed. 1040 and Nishimura Ekiu v. United States, 142 U.S. 651, 12 S.Ct. 336, 339, 35 L.Ed. 1146, but the court, on the basis of John Delaney's statement, does not believe he is subject to this section; but will hold that exclusion proceedings in this case were proper to determine the questions involved.

*Basis for holding John Delaney for a Board of Special Inquiry:*

The action in holding the applicant, John Delaney, for a Board of Special Inquiry was based upon a communication from Perry M. Oliver, Director of Administrative Services, General Office, dated September 25th, 1944;[10] this communication being in effect an information sheet containing the data given by John Delaney at the time of his registration under the Alien Registration Act of 1940, a copy of which has been made a part of the record of the Board of Special Inquiry, marked Ex. No. 2.

This Board of Special Inquiry denied the application of John Delaney for admission to the United States, and moved that he be excluded, on the grounds that (1) he is an alien immigrant not in possession of an unexpired immigration visa, as required by the Immigration Act of 1924, and the Alien Registration Act of 1940, and Executive Order No. 8766; and (2) is not in possession of a passport or official document in the nature of a passport issued by the Government of the country to which he owes allegiance or other travel document showing his origin and identity

as required by the Passport Act of May 22, 1918, as amended, 22 U.S.C.A. § 223 et seq. and Executive Order No. 8766, informing the applicant that he had a right to appeal from the decision to the Attorney General (Board of Special Inquiry Report, page No. 28).

On January 4th, 1946, the Commissioner entered an order affirming the excluding decision of the Board of Special Inquiry, but the Board of Immigration Appeals ordered the hearing reopened on January 15, 1946, to obtain additional evidence.

On October 9th, 1946, the Board of Immigration Appeals affirmed the Commissioner's decision of October 4th, 1946; and, on November 5th, 1946, the Commissioner recommended that the decision of the Board of Immigration Appeals on October 9th, 1946, be not disturbed.

*What constitutes the last date of entry of John Delaney into the United States?*

The petitioner, John Delaney, of course, takes the position that his last date of entry into the United States was on November 14th, 1924, when he arrived at Wilmington, North Carolina, on the SS "Nehian"; while the Government contends that his last date of entry was on May 20th, 1945, when he entered the United States at San Pedro, California, on the SS. "Schenectady". The record shows that while John Delaney had previously been in the United States, he returned to the United States aboard the SS. "Nehian", a British ship, arriving at Wilmington, North Carolina, on November 14th, 1924, as a member of the crew, in which his nationality was given as British, his race Irish, and his age twenty eight, and the court will assume such entry lawfully.

John Delaney stated that all of his employment, prior to 1924, while ashore in the United States, was mostly in the shipyards in and around New York; and that after his arrival at Wilmington, North Carolina, on November 14th, 1924, on the British

---

[10] John Delaney of 1761 East Broadway, Long Beach, Los Angeles, California, registered as an alien at Long Beach, California, on December 16, 1940, that he gave his date of birth as November 14, 1897, his place of birth at Cork, Ireland, his citizenship as British, his place of last entry into the United States as Wilmington, North Carolina, date of entry as November 14, 1924, means of entry as "Nehian."

SS. "Nehian", and up to the time of his departure from San Pedro, California, on June 10th, 1944, on the SS. "Schenectady", he had not left the United States in the interim for any foreign destination, and had worked in shipyards and laundries. The record is uncontradicted that he remained in this country, engaged in honest labor, was a man of good character, and had never been arrested.

The petitioner, John Delaney, takes the position, assuming that he was an alien at the time of his detention on May 21st, 1945, but not conceding this fact, that his last entry into the United States was on November 14th, 1924, on the British SS. "Nehian"; and that, as a matter of law, his arrival at the port of San Pedro, California, on May 20th, 1945, cannot be considered an entry in these exclusion proceedings under Sec. 19(a) of the Immigration Act of February 5, 1917, 39 Stat. 889, 8 U.S.C.A. § 155(a) supra. But with this contention the court, assuming it would be necessary to find that John Delaney was an alien at the time of his last entry, cannot agree.

*What does, and does not, constitute an entry by an alien into the United States?*

Petitioner John Delaney, in the instant proceeding, places great reliance on Ex Parte Kogi Saito, 18 F.2d 116, 117 (decided by the District Court, W. D. Washington, N. D. on March 23rd, 1927; and on the case of Matsutaka v. Carr, District Director of Immigration, 9 Cir., 47 F.2d 601, decided on February 24th, 1931, to support his contention that he did not make a re-entry into the United States at San Pedro, California, on May 20th, 1945, as that word is defined in the statutes and case law under consideration, but the court finds that these two cases are not in point.

Sec. 120.3 of Title 8 of the Code of Federal Regulations provides: "120.3. Arriving from any foreign port or place defined. 'Arriving in the United States from any foreign port or place' means arriving in 'the United States and any waters, territory, or other place subject to the jurisdiction thereof, except the Isthmian Canal Zone and the Philippine Islands', *from any port or place in a foreign country * * *."* (Italics supplied.)

In the Kogi Saito case, supra the Government contended that the petitioner, employed on American vessels sailing in British Columbia waters, reentered the United States on the return of the vessels, *but the record did not disclose that the petitioner had at any time left the vessel upon which he was employed as a cook.* (Italics supplied.) The court, in finding for the petitioner stated [18 F.2d 118]: "While departure by an alien from the United States, even though for a brief time, on re-entry, is subject to the Immigration Laws (Lewis v. Frick, 233 U.S. 291, 297, 34 S.Ct. 488, 58 L.Ed. 967; Lapina v. Williams, 232 U. S. 78 [34 S.Ct. 196, 58 L.Ed. 515], this has no application to a member of a crew on an American ship on foreign waters."

In the above case just referred to, it is to be noted that no foreign port was touched.

In United States ex rel. Claussen v. Day, Commissioner of Immigration, 279 U.S. 398, 49 S.Ct. 354, 73 L.Ed. 758, (decided May 13th, 1929) the Court had for consideration specifically what constituted an entry into the United States under the Immigration Act, and ruled that:

"Section 1 provides that 'United States,' as used in the Act, shall be construed to mean the United States and any waters, territory or other place subject to the jurisdiction thereof, except the Isthmian Canal Zone. An entry into the United States is not effected by embarking on an American vessel in a foreign port. Such a vessel outside the United States whether on the high seas or in foreign waters is not a place included within the United States as defined by the Act. See Cunard SS Co. v. Mellon, 262 U.S. 100, 122, 43 S.Ct. 504, 67 L.Ed. 894, 27 A.L.R. 1306; Scharrenberg v. Dollar S. S. Co., 245 U.S. 122, 127, 38 S.Ct. 28, 62 L.Ed. 189. The word 'entry' by its own force implies a coming from outside. The context shows that in order that there be an entry within the meaning of the Act there must be an arrival from some foreign port or place. There is no such entry where one goes to sea on board an American vessel from a port of the

# 319

United States and returns to the same or another port of this country without having been in any foreign port or place. See Sections 19, 32, 33, 35 [8 U.S.C.A. §§ 155, 167 note, 168, 169].

"And it is clear that petitioner departed from the United States on the 'Elisha Atkins' and that, when he landed at Boston on his return from South American and Cuban ports, he made an entry into the United States within the meaning of the Act."

"[Syllabus 4]: In order that there may be an entry within the meaning of the Act, there must be an arrival from some foreign port or place. Id. 16 F.2d 15 affirmed."

In the case of Matsutaka v. Carr, 47 F.2d 601, decided by the Circuit Court of Appeals for the 9th Circuit on February 24th, 1931, relied upon by the petitioner, John Delaney, the question for decision was whether an alien seaman who had resided in the United States for a period barring his deportation for an illegal entry was entitled to reenter the United States upon his return from a fishing voyage in foreign waters as a member of the crew of an American fishing vessel. The court said: "This question was answered in the affirmative by this court in Weedin v. Banzo Okada, 9 Cir., 2 F.2d 321, and that decision has been generally followed by the District Courts of this Circuit. Ex Parte T. Nagata, D.C., 11 F.2d 178; Ex Parte Kogi Saito, D.C., 18 F.2d 116." *The appellant shipped for a voyage from San Diego, Calif., to Mexican waters and return. No foreign port was named, and it is questionable, at least, whether any foreign port or place was in fact entered.* (Italics supplied.)

See also the case of United States ex rel. Stapf v. Corsi, 287 U.S. 129, 53 S.Ct. 40, 77 L.Ed. 215, decided on November 7th, 1932, which held that the relator's arrival into this country was an entry, notwithstanding he was a member of the crew of an American ship which had made a round trip voyage where he came from a place outside the United States, and from a foreign port or place, where the vessel had docked for two and one-half days, and there was no indication that the alien had gone ashore, within the meaning of the Immigration laws, citing United States ex rel. Claussen v. Day, 279 U.S. 398, 49 S.Ct. 354, 73 L.Ed. 758.[11]

In the case of Taguchi v. Carr et al., decided by the Circuit Court of Appeals for the Ninth Circuit, on December 19th, 1932, 62 F.2d 307, which was a habeas corpus case, the appellant had entered into the United States unlawfully at Seattle on August 14th, 1918, and had remained continuously in this country until about July, 1931, when he signed on an American fishing boat at San Pedro, Calif., to engage in fishing on the high seas and in Mexican waters. The court:

"It appears that this vessel proceeded southward along the Mexican coast in the Channel between Santa Margarita Island and the mainland of Mexico for the purpose of fishing. * * * 'That while on a fishing trip on this boat and during a heavy storm the fishing boat collided with another and sank off Santa Margarita Island, Lower California, Mexico; that in order to save the petitioner's life the captain instructed him to land on said island, where he remained until the American tug boat Homer picked up the petitioner and brought him to San Pedro, California, arriving on or about the 27th day of September, 1931'.

"The Board of Special Inquiry at San Pedro, California, after hearing, denied

---

[11] The one case that seems to aid the petitioner, Delaney, is Weedin v. Banzo Okada, 2 F.2d 321, a case decided by the Circuit Court of Appeals for the Ninth Circuit on November 24th, 1924, which decision antedates the group of decisions under discussion, and which it would seem has been subsequently overruled by the Ninth Circuit. The Circuit Court at that time took the view that where a Chinaman, a member of the crew, was permitted by the captain to land for a few hours at the port of Sydney that the petitioner had not made a new entry into the United States. The decision in this case evidently hinged on the fact that the Government was dealing with a Chinaman, and that the captain of the vessel would have been under a penalty if he (the captain) had not returned the petitioner to this country.

appellant admission to the United States and held him subject to deportation. The specific grounds upon which appellant was denied admission are that 'he is an immigrant alien not having in his possession an unexpired immigration visa as required by the Immigration Act * * *.' "

The court went on to say: "This situation might well appeal to us if we had any discretion in the matter, but we have none; and the sole question is whether or not appellant comes within the provisions of the Immigration laws.

"Unfortunately, appellant is the author of his own misfortune. As a fisherman, he must have known the perils of the sea, and in making the voyage into foreign waters he knew that he might not be able to return to the United States. In fact, he testified at the hearing: 'I fully understood that touching any foreign land would make it difficult for me to return to the United States and it would be against the Immigration laws, but during a heavy storm our ship collided with another and sank off Santa Margarita Island, Lower California, Mexico. It was either life or death, and the captain instructed us to land on Santa Margarita Island, and everything would be all right. I have nothing else to offer'.

"Under the immigration laws and the interpretation placed thereon by the Supreme Court, we are compelled to hold that, notwithstanding the misfortune which befell appellant, he was coming from a foreign country and therefore was subject to the immigration laws the same as though he had never resided in the United States. United States ex rel. Stapf, Petitioner v. Corsi, Commissioner of Immigration, [287 U.S. 129], 53 S.Ct. 40, 77 L.Ed. 215, decided by Supreme Court November 7, 1932."

The Supreme Court of the United States, in United States ex rel. Volpe v. Smith, 289 U.S. 422, 53 S.Ct. 665, 667, 77 L.Ed. 1298, decided on May 22nd, 1933, had under consideration the specific question of what constituted an entry into the United States and said:

"The power of Congress to prescribe the terms and conditions upon which aliens may enter or remain in the United States is no longer open to serious question. Turner v. Williams, 194 U.S. 279, 24 S.Ct. 719, 48 L.Ed. 979; Low Wah Suey v. Backus, 225 U.S. 460, 468, 32 S.Ct. 734, 56 L.Ed. 1165; Bugajewitz v. Adams, 228 U.S. 585, 591, 33 S.Ct. 607, 57 L.Ed. 978.

"That the second coming of an alien from a foreign country into the United States is an entry within the usual acceptation of that word is clear enough from Lewis v. Frick, 233 U.S. 291, 34 S.Ct. 488, 58 L.Ed. 967; United States ex rel. Claussen v. Day, 279 U.S. 398, 49 S.Ct. 354, 73 L.Ed. 758."

The latest decision of the Circuit Court of Appeals for the Ninth Circuit is in the case of Del Guercio, District Director, Appellant, v. Delgadillo, 159 F.2d 130, in which case appellee, a citizen of Mexico, was admitted to the United States for permanent residence in 1923, and continued to reside here until June, 1942. During that month he shipped as a member of the crew of the American Ship "Andrew Jackson", then under the operational control of the United States Government, through the War Shipping Administration. On July 12th, 1942, the "Andrew Jackson" was torpedoed by the enemy off the coast of Cuba. Appellee was rescued and taken to Cuba, where he remained one week. He was then flown to Miami, Florida, and admitted to the United States in transit by immigration officers for a period of not more than thirty days for the purpose of reshipping foreign from San Pedro, California. The Circuit Court held that his arrival at Miami, Florida, in July, 1942, after landing in Cuba, was an entry within Sec. 19(a) of the Immigration Act and that he was subject to deportation for having been convicted of second degree robbery and sentenced to imprisonment from one year to life, within five years after this last entry into the United States.

█ The rulings of the foregoing authorities on what constitutes an entry or reentry by the Circuit Court, and by the Supreme Court of the United States, may be recapitulated as follows: Where there is a departure from the United States, even into foreign waters, and a return into the United States, without the vessel having

touched at a foreign port, no entry exists on the part of an alien entering or reentering into the United States; but where a foreign port is touched, even though involuntarily on the part of the alien, a return into the United States constitutes an entry or a reentry, under Sec. 19(a) of the Immigration Act of February 5, 1917, 39 Stat. 889, 8 U.S.C.A. § 155(a) (which Section, by the way, was intended to protect this country from criminals). United States ex rel. Volpe v. Smith, 289 U.S. 422, 53 S.Ct. 665, 77 L.Ed. 1298.

█ John Delaney, even though he enlisted in the U. S. Merchant Marine from the highest of patriotic motives, was accepted as an American citizen by jus soli, on the documentary evidence that he had in his possession at the time he enlisted, was in the zones of combat, risked his life for his country, and had no control over his destination in foreign territory, nevertheless, he must be held to have made a reentry into this country when he landed at San Pedro, California, on the SS. "Schenectady" on May 20th, 1945, as the word "entry" or "reentry" is defined in the Statute, as interpreted by the courts. It is just another example of an unjust law that should be changed by Congress, or re-examined by the courts.

Had the petitioner, John Delaney, been a slacker in the recent war, and remained in the United States, this question would not have arisen. The government he served and helped preserve now would deny him the right to remain in this country, or technically, would deny his reentry therein.

He was above the age of those called for actual combat; he could have secured noncombatant work in the United States. His error, if any, in the eyes of a highly technical construction of the law, was that he served during the war in an important branch of that great effort and did his bit to preserve our liberties.

Now our government, instead of commending him for patriotic service in the highest and best traditions of our history, would deny him the right to remain in this country. He registered for the draft; he claimed no exemption as many others did.

This court joins the judges of the Ninth Circuit in pointing out the harshness and injustice of the law. Circuit Judge Sawtelle, speaking for a unanimous court (Wilbur, Mack), In re Taguchi v. Carr, supra, said: "This situation might well appeal to us if we had any discretion in the matter, but we have none; and the sole question is whether or not appellant comes within the provisions of the immigration laws."

The vigorous dissent of Justice Murphy in re Cleveland v. United States, 329 U.S. 14, 67 S.Ct. 13, 20, is worthy of note.[12]

While the decisions of the Ninth Circuit are binding on this court, and decisions of the Supreme Court binding on both the Circuit Court and this court, it is refreshing to find expressions such as we find from the pen of Justice Rutledge in the Cleveland case. It is the opinion of this court that the harshness, severity and injustice of several provisions of the immigration laws should be corrected by the

---

12 (Dissent of Justice Murphy) "Yet this court in Caminetti v. United States, 242 U.S. 470, 37 S.Ct. 192, 61 L.Ed. 442, L.R.A.1917F, 502, Ann.Cas.1917B, 1168, over the vigorous dissent of Justice McKenna in which Chief Justice White and Justice Clarke joined, closed its eyes to the obvious and interpreted the broad words of the statute without regard to the express wishes of Congress. I think the Caminetti case can be factually distinguished from the situation at hand since it did not deal with polygamy. But the principle of the Caminetti case is still with us today, the principle of interpreting and applying the White Slave Traffic Act [18 U.S.C.A. § 397 et seq.] in disregard of the specific problem with which Congress was concerned. I believe the issue should be met squarely and the Caminetti case overruled. It has been on the books for nearly 30 years and its age does not justify its continued existence. Stare decisis certainly does not require a court to perpetuate a wrong for which it was responsible, especially when no rights have accrued in reliance on the error. Cf. Helvering v. Hallock, 309 U.S. 106, 121, 122, 60 S.Ct. 444, 452, 453, 84 L. Ed. 604, 125 A.L.R. 1368. Otherwise the error is accentuated; and individuals, whatever may be said of their morality, are fined and imprisoned contrary to the wishes of Congress. I shall not be a party to that process."

322

higher courts or by Congress. This court has no power except to respectfully make the suggestion. Trial courts come in direct contact with many of these problems.

The court, up to this point, has assumed tthat John Delaney was an alien, but without having expressed its opinion as to his status.

*Was John Delaney an American citizen by jus soli at the time of his arrival at San Pedro, California, on the SS. "Schenectady" on May 20th, 1945?*

■ This court has read with considerable care the proceedings had at San Pedro, California, before the Board of Special Inquiry, dated May 21st, 1945; May 22nd, 1945; May 23rd, 1945; May 28th, 1945; June 9th, 1945; June 22nd, 1945, and June 26th, 1945; and the proceedings before the reopened hearing at the same place on September 18th, 1946, together with the exhibits attached thereto, at which hearings John Delaney was examined by different examiners, to ascertain his status as an American citizen, native born; and, while there are contradictory statements of John Delaney in the record, having in mind the conditions under which they were made, and the exigencies in which John Delaney found himself at the time, the Court feels that John Delaney has established his status as a native born American Citizen, having been born in Brooklyn, New York, on November 14th, 1898, and will so hold. The court is assuming that, because this is an exclusion proceeding, John Delaney has the burden of proof to establish this fact by a fair preponderance of the evidence.

Quære: When John Delaney joined the United States Maritime Service, the United States Government accepted him as an American citizen, based upon his oath of allegiance to the United States and whatever documentary evidence of that fact he happened to have in his possession at that time, when it was known that he would be risking his life for his country; and, if the Government wished to dispute his American citizenship, why did it not do so at that time, instead of waiting until he arrived on the SS. "Schenectady" at San Pedro, California, on May 20th, 1945?

John Delaney stated his father's name was Michael Delaney and that, according to his knowledge and belief, he (the father) was born in Cork County, Ireland; lived in the United States many years, but did not know the dates; that his mother, Margaret Bridget Whalen, was born in Ireland and might have become a citizen of the United States. John Delaney stated that his father and mother were married in Philadelphia, Pennsylvania, that they later moved to Brooklyn, New York; that he was a week old when his mother died in Brooklyn, New York; that his father later married his stepmother, Mary Grady Delaney; that his father later returned to Ireland and died there when he (John Delaney) was about eighteen or nineteen years of age; and that his stepmother, Mary Grady Delaney, took him to Ireland when he was about two or three years old.

The strongest written evidence in the case to support this contention of John Delaney's birth in the United States is the certificate of marriage of his parents, a certified copy of which is in evidence as petitioner's Exhibit No. 1, showing that M. Delaney and Bridget Whalen were married in Philadelphia on October 22nd, 1896. According to John Delaney's delayed birth certificate, John Delaney represents himself as having been born at Brooklyn, New York, on November 14th, 1898, or a little over two years after his parents' marriage, which delayed birth certificate represents his father to be Michael John Delaney, and his mother to be Mary Grady, rather than Margaret Bridget Whalen, his natural mother. While the respondent herein doubts that the names appearing on the marriage license, exhibit 1, are the names of his natural parents, nevertheless, it seems to the court that John Delaney must have received information from some original source that his parents had been married in Philadelphia on or about the date indicated, for, if such had not been the case, he would have been writing to every Bureau of Vital Statistics in the country to have obtained such a certificate with the name of Delaney thereon.

*Hearsay evidence admissible to prove pedigree.*

▇ John Delaney further stated that his father had told him that he (John Delaney) had been born in America and that he (John Delaney) had been brought to Ireland by his stepmother after he (the father) had returned to Ireland (page 31 of the record of the hearing before the Board of Special Inquiry). While this statement on the part of John Delaney may be hearsay and a self-serving declaration, nevertheless, under one of the exceptions to the hearsay rule of evidence, it is admissible for whatever weight the court may desire to give to it.

Under Sec. 1870 of the Code of Civil Procedure of the State of California, and in conformity with the provisions therein, subd. 4, evidence may be given upon a trial of the following facts: "The act or declaration, verbal or written, of a deceased person in respect to the relationship, birth, marriage, or death of any person related by blood or marriage to such deceased person * * *." subject, of course, to being disproved by the opposing side. This the Immigration and Naturalization Service has not done to the satisfaction of the court. See also Sec. 312 (316) of Jones on Evidence Civil Cases (second edition)[13]

"The testimony of a father, that his children were born in California, puts the question of their citizenship beyond cavil. Thompson v. Spray, *72* Cal. 528, 14 P. 182.

▇ "Evidence that a certain person was born in New York, was taken at a tender age to Ireland, and then returned to this country, justifies the court in finding him to be a citizen, despite the fact that, believing himself to be an alien, he had filed a declaration of intention to become a citizen. Golden Fleece Gold etc. Min. Co. v. Cable Cons. Gold, etc. Min. Co., 12 Nev. 312" (11 C.J. p. 787—Note A, See also 14 C.J.S., Citizens, § 18). The court feels that, regardless of who has the burden of proof to prove citizenship and/or alienage, which is evidently on the petitioner in view of the fact that this is an exclusion proceeding, that John Delaney has met this burden by a fair preponderance of the evidence by his allegations of birth in this country, in accordance with one of the exceptions to the hearsay rule of evidence, which allegations have not been disproved by the respondent, although the respondent conducted extensive investigations in Ireland to prove his birth in that country.

John Delaney remembers that when his father put him to school in Ireland he registered him as a citizen of the United States; and that he attended the national school Shambalcy in the County of Cork, and the Carrigaline male National school in the County of Cork, Ireland. He quit school at about fourteen or fifteen years of age, and first went to sea when he was a youngster, as a wiper—about eighteen years or less. John Delaney further stated that when he first returned to the United States on the "John Ludgate" he gave his nationality as an American (page 35); and that when he shipped out of the United States during 1917 or 1918, he gave his nationality as American; also that when he registered for the draft in 1917 he registered as a United States citizen, but was turned down because of flat feet; also,

---

13 Sec. 312 (316) of Jones on Evidence, Civil Cases (2nd Ed.) "Declarations as to pedigree—reason for the exception (to the hearsay rule). The well known exception to the general rule excluding hearsay, under which certain declarations of deceased persons may be admitted in cases of pedigree, rests in part on the supposed necessity of receiving such evidence to avoid a failure of justice, and in part on the ground that individuals are generally supposed to know and to be interested in those facts of family history about which they converse, and that they are generally under little temptation to state untruths in respect to such matters which might be readily exposed. * * * The declarations of deceased persons may be received, subject to the qualifications hereafter named, when such declarations refer to the age, relationship, birth, marriage, death or legitimacy of persons legally related by blood or marriage to the declarant. But the declarations must have been made before the controversy in relation to which they are to be proved arose."

when he registered under the present Selective Service System, he represented himself to be an American citizen by birth.

John Delaney has maintained a residence in the United States for about thirty years, and during this time. he has never left the United States for any purpose other than to follow the occupation of a seaman, and the animus revertendi has always been present in his heart and mind.

 Generally it is presumed, at least until the contrary appears, that every person is a citizen of the country in which he resides. Shelton v. Tiffin, 6 How. 163, 47 U.S. 163, 12 L.Ed. 387.

According to his testimony he has:

(1) Never applied to any American consul for an immigration visa;

(2) Never paid a head tax at any immigration port of entry; ·

(3) Never been excluded from admission to the United States;

(4) Never been deported from the United States;

(5) Never been confined in an institution for the treatment of the insane or feeble minded;

(6) Never been arrested;

(7) Never applied for admission to the United States for permanent residence as an alien;

(8) Never been admitted to. the United States as an alien for permanent residence;

(9) Never has had an American or British passport, or a passport of any other country;

(10) Never has had in his possession any kind of an official paper issued by any country showing his birth place and citizenship, except seaman's discharge papers;

(11) Never lived in England;

(12) Never voted in England; but:

(13) has voted in New York in 1926 and/or 1927, and in Long Beach, California, in 1941, or at any rate has been registered to vote.

The Government, as is reflected by the record of these proceedings, made extensive investigations, both in this country and in Ireland, to disprove the contention of John Delaney that he was born in Brooklyn, New York, but without success.

*Contradictory statements and/or untrue statements, of John Delaney considered by the court:*

The court is well aware of the fact that there are contradictory and/or untrue statements in the record which give considerable weight to the contention of the Immigration and Naturalization service that John Delaney is not an American citizen by birth, and which warrant his being excluded from this country, all of which have been considered by the court, but it will not be necessary to refer to all of them.

In the hearing before the Board of Special Inquiry, held at San Pedro, California, (page 3 of the record) petitioner John Delaney stated that the reason he told the authorities of the vessel "Nehian", in November of 1924, that he was a British subject was that they would not have hired an American citizen; and likewise, when asked why he registered as an alien on December 16th, 1940, at Long Beach, California, he stated he could get no record of his birth in Brooklyn, New York, and· needed a record to obtain employment.

The court believes that John Delaney has satisfactorily answered the questions as to why he represented himself to be a British subject in November of 1924, when he shipped on the SS. "Nehian" in 1924; and registered as a friendly alien during World War Two on December 16th, 1940, at Long Beach, California; which èvents both happened prior to the time he was able to obtain a certified copy of his parents' marriage in Philadelphia, Pa., dated December 1st, 1943, mailed to him from Philadelphia by the Department of Public Health.

Since 1941, John Delaney has consistently maintained his American birth in Brooklyn, New York, as is evidenced by his application for original license (Ex. 5); his Application for identification card (Ex. 6); and his application for extension of route or raise of grade of license (Ex. 7), all attached to the record of hearing before the Board of Special Inquiry held at San Pedro, California, in which he represented himself as having been born in this country.

This court, in addition to the statements made by John Delaney relative to his pedigree, clearly admissible as exceptions to the hearsay rule of evidence, will require no greater documentary evidence of his citizenship than that which was acceptable to the United States Maritime Service when he joined that service. John Delaney, as a second Assistant Engineer on the SS. "Schenectady", went into the war zones to risk his life, or even die for his country, if necessary, all the time firmly believing that he was an American citizen by birth. If John Delaney had been less patriotic and more timid, in other words a slacker, he would not have found himself in his present predicament, or have been incarcerated by the Immigration officials at San Pedro, California, for six weeks practically incommunicado. John Delaney is not a homo sine patria, but a citizen of the United States by jus soli, and is not subject to exclusion proceedings. His domicile or residence is in the United States of America.

In the case of People v. Guariglia, 187 Misc. 843, 65 N.Y.S.2d 96, 100, a seduction case, where the court had for consideration the question of whether or not the statute of limitations of that state ran against the defendant while he was without the State of New York as a member of the United States Army in the European theatre of operation, the Court held that it did on the theory that he continued to be an inhabitant or resident of the State. The court said:

"Applied to the instant case, it is clear that while the defendant was in the armed forces he continued to be both an inhabitant and a resident of the State. Indeed the People stipulated on the trial that at and prior to September 24, 1943, the date of the seduction 'the defendant resided in the County of Kings State of New York, where he was domiciled. * * * That from October 15, 1943 to on or about December 15, 1945, continuously, the defendant was without the State of New York as a member of the U. S. Army in the European theatre of operations under the orders of his superior, and that his domicile continued in the State of New York during that period.'

"Even in the absence of such stipulation the decisions hold that a soldier continues to be an inhabitant or resident of the State for the purpose of voting etc. 'In legal phraseology "residence" is synonymous with "inhabitancy" or "domicile"'. De Meli v. De Meli, 120 N.Y. 485, 491, 24 N.E. 996, 998, 17 Am.St.Rep. 652. '* * * A soldier in military service remains an inhabitant of the State. * * *' 15 Am.Jur. 37. 'A seaman on a long voyage and a soldier in actual service, may be respectively inhabitants of a place, though not personally present there for years.' Sears v. City of Boston, 1 Metc. 250, 42 Mass. 250." (Italics supplied.)

If this theory should be supported by the Circuit Court of Appeals for the Ninth Circuit it would make no difference whether or not John Delaney was, or was not, a native born citizen of the United States by jus soli during the time he was on the SS. "Schenectady", for, in legal contemplation, he never did leave the United States.

The writ of habeas corpus is hereby granted; the petitioner, John Delaney, is ordered released from technical custody, and his bond is ordered exonerated.

Counsel for the petitioner will prepare Findings of Fact and Conclusions of Law, and a judgment, in accordance with this opinion, within ten days, after having presented same to counsel for the respondent herein for approval as to form.